# ECONOMIC AND FINANCIAL CONSULTING GROUP, INC.

6 RICHLAND HILLS COVE • CONWAY, AR 72034 • (501) 450-1306

November 25, 2024

Dortch Lindstrom Livingston Law Group
4306 Yoakum Blvd., Suite 270
Houston, TX 77006

RE: **Estate of Austin Madubuike**

Dear Mr. Lindstrom

At your request, I have performed computations concerning the value of the loss of life of Austin Madubuike (Madubuike) in connection with the wrongful death lawsuit resulting from his death on October 23, 2022. My computations are discussed in detail below.

**LOSS OF LIFE**

Running through the history of economic thought there has been a general consensus that the monetary value of life can, *at a minimum*, be determined by the present value of projected lifetime earnings. Present value represents the amount of money that would be needed at a point in time so that with appropriate financial investments a flow of lifetime earnings could be duplicated. The present value of projected lifetime earnings is commonly called "human capital" in economic literature. Conceptually, human capital is identically equal to the concept of "earning capacity" that appears in tort litigation. The present value of projected lifetime earnings can be simultaneously interpreted as a measure of the loss of life suffered by the decedent because it represents the loss of human capital or earning capacity that would have provided the basis for lifetime personal expenditures and also a societal loss because of the elimination of the decedent's productive efforts from which society would have derived benefit. It should be stressed that the

Exhibit A

valuation of human capital is identical to computations of lost earning capacity which arise in personal injury litigation and can be calculated with equal precision. As stated above, this approach should be construed as yielding a *minimum* measure of the value of life because it focuses exclusively on lifetime earnings and ignores many other aspects of the value of life. Given these comments, a starting point for my analysis of loss of life would entail a consideration of the present value of the income and fringe benefit flows that would have been generated by Madubuike had he remained alive. This component of loss of life as well as the residual value of life in excess of earning capacity is discussed below.

Present Value of Potential Lifetime Earnings

The evaluation of the present value of Madubuike's potential lifetime earnings, which represents his human capital or earning capacity, entails a consideration of the income flows that he could have generated had he remained alive. In calculating Madubuike's lost earning capacity, I have considered three scenarios. Scenario (1) assumes that Madubuike would have had an annual earning capacity equal to the average earnings of males with some college. Scenario (2) assumes that Madubuike would have had an earning capacity equal to the average earnings of male college graduates. Scenario (3) assumes that Madubuike would have had an earning capacity equal to the earnings, ranging from the 25th to the 75th percentile, of males with a law degree. In assigning a value to these income flows, a distinction should be made between past and projected future magnitudes. Past potential earnings are not discounted; however future potential earnings should be discounted and converted into present value terms. Past earnings are not calculated in the present instance. The present value of projected future income for the scenarios identified above is calculated in accordance with the equation below:

$$\text{Present Value of Future Income} = \sum_{t=1}^{T} \text{Base income}/(1 + r)^t$$

where $T$ = work life expectancy which is alternatively assumed to be 35.23 or 43.00 additional years at age 24 for Scenario (1); 38.92 or 43.00 additional years at age 24 for Scenario (2); or 40.16 or 41.00 additional years at age 26 for Scenario (3). The lower end of these ranges is based on statistical work life expectancies based on Gary R. Skoog, James E. Ciecka, and Kurt V. Krueger: "The Markov Process Model of Years to Final Separation from the Labor Force 2012-2017: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors", *Journal of Forensic Economics* 28(1-2), 2019. The upper end of the ranges is based on an assumed retirement at age 67.

Base Income (Scenario 1) = $45,490.00 for year 1 (age 24); $61,620.00 per year for years 2-11 (ages 25-34); $80,010.00 per year for years 12-21 (ages 35-44); $83,340.00 per year for years 22-31 (ages 45-54); $84,670.00 per year for years 32-41 (ages 55-64) and $83,970.00 per year thereafter, based on the United States Census

Bureau publication: *Current Population Survey, 2024 Annual Social and Economic Supplement*, table PINC-04.

Base Income (Scenario 2) = $60,240.00 for year 1 (age 24); $94,100.00 per year for years 2-11 (ages 25-34); $115,900.00 per year for years 12-21 (ages 35-44); $133,300.00 per year for years 22-31 (ages 45-54); $131,900.00 per year for years 32-41 (ages 55-64) and $126,400.00 per year thereafter, based on the United States Census Bureau publication: *Current Population Survey, 2024 Annual Social and Economic Supplement*, table PINC-04.

Base Income (Scenario 3) = $0.00 for years 1-2 (ages 24-25); $98,030.00 per year for years 3-11 (ages 26-34); $145,760.00 per year for years 12-32 (ages 35-54); and $217,360.00 per year thereafter. The annual base incomes identified above assume that after entering the legal profession at age 26 Madubuike would have earned at the 25th percentile of that profession to age 35, would have generated median earnings from age 35 through age 54, and would have earned at the 75th percentile thereafter. Earnings data for attorneys is documented by the United States Bureau of Labor Statistics publication: *Occupational Employment and Wage Statistics, May 2024*.

r = discount factor used to convert future magnitudes into present value terms. For computational purposes I have assumed r to be equal to 2.5% to reflect the real rate of return (interest minus inflation) on inflation-indexed government bonds. These bonds would be a financial instrument almost perfectly suited to protecting against the effects of future inflation.

Performing the calculation indicated by the equation and assumptions above yields a present value of projected future income ranging from **$1,694,652.83** to **$3,512,568.89**. My computations are presented on a year by year basis in the attached Tables (1) through (3), which are based on Scenarios (1) through (3), respectively.

Fringe Benefits

For computational purposes, fringe benefits are assumed to amount to 30.0% of income. This figure is based on data contained in the United States Department of Labor publication: *Employer Costs for Employee Compensation – June, 2024* which indicates that fringe benefits, net of paid vacation and time off, on average amount to 30.0% of income for civilian employees in the United States. Applying this percentage to the present value of projected future income, calculated above, yields fringe benefit valuations in the range **$508,395.85** to **$1,053,770.67** for Scenarios (1) through (3). Fringe benefit losses can be computed on a year by year basis by multiplying the figures in Tables (1) through (3) by the assumed fringe benefit percentage.

Adding the values of projected income and fringe benefits yields a total valuation in the range

**$2,203,048.68** to **$4,566,339.56**. This range should be interpreted as a measure Madubuike's human capital or earning capacity.

Residual Value of Life in Excess of Earning Capacity

As discussed above, the present value of lifetime earnings would represent a minimum valuation of the loss of life because it focuses exclusively on productivity and ignores other aspects of the value of life. Many of life's joys, pleasures, and services, which are independent of earning capacity and are generally considered to be priceless, have been lost as a result of Madubuike's death. Consequently, my figures should not be interpreted as capturing the total value of loss of life but rather those aspects of loss of life that are readily quantifiable. In the attached Table (4), I have noted that additional figures for the residual value of life are to be determined by the jury. I have provided information on Madubuike's statistical life expectancy, 56.20 additional years at the time of his death, based on the Center for Disease Control publication: *United States Life Tables, 2019* to assist the jury in this determination. I have also provided computations, summarized in the attached Table (5), in which future residual value of life figures can be reduced to present value. Reducing future amounts to present value is consistent with the methodology advocated by the United States Government, Office of Management and Budget (OMB) in *Circular A-4*, September 17, 2003, in which guidelines for incorporating statistical value of life into cost/benefit analysis are established. This approach provides a more fairly determined measure of damages for defendants determined to be liable. The methodology encompassed in my computations could be utilized for any annual value determined by the jury.

Since the jury will be instructed and charged to arrive at a figure for loss of life damages, I have researched this issue and can provide assistance in determining the value that government agencies place on the statistical value of life. The attached documents, published by the United States Department of Transportation (DOT) and the Environmental Protection Agency (EPA), suggest statistical values of life amounting to $12,187,725.00 and $11,184,498.00, respectively. The DOT and EPA valuations have been adjusted to the current price level. United States Census Bureau data documents a median age across the United States population amounting to 38.9 years. Life expectancy, based on this age, amounts to 41.8 additional years. Dividing the statistical values of life identified above by remaining life expectancy, yields average annual evaluations of $290,184.00 and $266,298.00, in nominal terms, for DOT and EPA statistical values of life, respectively. Larger annual amounts would be necessary to yield the above cited valuations in present value terms. The annual amounts cited above are generally consistent with the loss of life damages awarded by Judge Timothy Brooks in the Arkansas case: *Estate of Jerry R. Kolpek v. United States of America* (Western District of Arkansas: 5:21-CV-05116). In that matter, Judge Brooks loss of life award of $1,600,000.00 translated into an annual amount of $246,000.00, in nominal terms, over a 6.50-year life expectancy. As above, a larger annual amount would be necessary to yield Judge Brooks' figure in present value terms. The OMB, as well as other government agencies, have suggested guidelines and endorsed statistical values of life for various cost/benefit analyses that have been performed. Total and implicit annual statistical values of life

for these government studies, adjusted to current price levels, are presented in the attached Table (6). I also attach recent *Wall Street Journal* and *New York Times* articles on this topic.

In summary, Madubuike's loss of life would be worth at least **$2,203,048.68** to **$4,566,339.56**, the present value of his expected lifetime earnings plus fringe benefits or human capital. Losses associated with the residual value of life should be considered in addition to this amount in order to arrive at a more accurate valuation of the loss of life suffered by Madubuike.

My computations of economic loss are summarized in the attached tables.

This report reflects information and opinions as of the date of the report and may be amended if additional data or information becomes available. If I can be of further service in this matter, please do not hesitate to contact me.

Yours very truly,

*Ralph D. Scott, Jr.*

RALPH D. SCOTT, JR., Ph.D.

TABLE 1

ESTATE OF AUSTIN MADUBUIKE
CALCULATION OF HUMAN CAPITAL / EARNING CAPACITY
SCENARIO 1

| Year | Age | Base Income | Year Fraction | Projected Income | Present Value Factor | Economic Loss | Cumulative Economic Loss |
|---|---|---|---|---|---|---|---|
| **FUTURE:** | | | | | | | |
| 2024/25 | 24 | $ 45,490.00 | 1.0000 | $ 45,490.00 | 0.9756 | $ 44,380.49 | $ 44,380.49 |
| 2025/26 | 25 | 61,620.00 | 1.0000 | 61,620.00 | 0.9518 | 58,650.80 | 103,031.29 |
| 2026/27 | 26 | 61,620.00 | 1.0000 | 61,620.00 | 0.9286 | 57,220.30 | 160,251.59 |
| 2027/28 | 27 | 61,620.00 | 1.0000 | 61,620.00 | 0.9060 | 55,824.68 | 216,076.27 |
| 2028/29 | 28 | 61,620.00 | 1.0000 | 61,620.00 | 0.8839 | 54,463.10 | 270,539.37 |
| 2029/30 | 29 | 61,620.00 | 1.0000 | 61,620.00 | 0.8623 | 53,134.73 | 323,674.10 |
| 2030/31 | 30 | 61,620.00 | 1.0000 | 61,620.00 | 0.8413 | 51,838.76 | 375,512.86 |
| 2031/32 | 31 | 61,620.00 | 1.0000 | 61,620.00 | 0.8207 | 50,574.40 | 426,087.27 |
| 2032/33 | 32 | 61,620.00 | 1.0000 | 61,620.00 | 0.8007 | 49,340.88 | 475,428.15 |
| 2033/34 | 33 | 61,620.00 | 1.0000 | 61,620.00 | 0.7812 | 48,137.45 | 523,565.59 |
| 2034/35 | 34 | 61,620.00 | 1.0000 | 61,620.00 | 0.7621 | 46,963.36 | 570,528.96 |
| 2035/36 | 35 | 80,010.00 | 1.0000 | 80,010.00 | 0.7436 | 59,491.91 | 630,020.86 |
| 2036/37 | 36 | 80,010.00 | 1.0000 | 80,010.00 | 0.7254 | 58,040.88 | 688,061.75 |
| 2037/38 | 37 | 80,010.00 | 1.0000 | 80,010.00 | 0.7077 | 56,625.25 | 744,687.00 |
| 2038/39 | 38 | 80,010.00 | 1.0000 | 80,010.00 | 0.6905 | 55,244.15 | 799,931.15 |
| 2039/40 | 39 | 80,010.00 | 1.0000 | 80,010.00 | 0.6736 | 53,896.73 | 853,827.88 |
| 2040/41 | 40 | 80,010.00 | 1.0000 | 80,010.00 | 0.6572 | 52,582.18 | 906,410.06 |
| 2041/42 | 41 | 80,010.00 | 1.0000 | 80,010.00 | 0.6412 | 51,299.68 | 957,709.74 |
| 2042/43 | 42 | 80,010.00 | 1.0000 | 80,010.00 | 0.6255 | 50,048.47 | 1,007,758.21 |
| 2043/44 | 43 | 80,010.00 | 1.0000 | 80,010.00 | 0.6103 | 48,827.78 | 1,056,585.99 |
| 2044/45 | 44 | 80,010.00 | 1.0000 | 80,010.00 | 0.5954 | 47,636.86 | 1,104,222.85 |
| 2045/46 | 45 | 83,340.00 | 1.0000 | 83,340.00 | 0.5809 | 48,409.26 | 1,152,632.11 |
| 2046/47 | 46 | 83,340.00 | 1.0000 | 83,340.00 | 0.5667 | 47,228.55 | 1,199,860.66 |
| 2047/48 | 47 | 83,340.00 | 1.0000 | 83,340.00 | 0.5529 | 46,076.63 | 1,245,937.29 |
| 2048/49 | 48 | 83,340.00 | 1.0000 | 83,340.00 | 0.5394 | 44,952.81 | 1,290,890.10 |
| 2049/50 | 49 | 83,340.00 | 1.0000 | 83,340.00 | 0.5262 | 43,856.40 | 1,334,746.50 |
| 2050/51 | 50 | 83,340.00 | 1.0000 | 83,340.00 | 0.5134 | 42,786.73 | 1,377,533.24 |
| 2051/52 | 51 | 83,340.00 | 1.0000 | 83,340.00 | 0.5009 | 41,743.15 | 1,419,276.39 |
| 2052/53 | 52 | 83,340.00 | 1.0000 | 83,340.00 | 0.4887 | 40,725.03 | 1,460,001.42 |
| 2053/54 | 53 | 83,340.00 | 1.0000 | 83,340.00 | 0.4767 | 39,731.74 | 1,499,733.15 |
| 2054/55 | 54 | 83,340.00 | 1.0000 | 83,340.00 | 0.4651 | 38,762.67 | 1,538,495.82 |
| 2055/56 | 55 | 84,670.00 | 1.0000 | 84,670.00 | 0.4538 | 38,420.75 | 1,576,916.58 |
| 2056/57 | 56 | 84,670.00 | 1.0000 | 84,670.00 | 0.4427 | 37,483.66 | 1,614,400.24 |
| 2057/58 | 57 | 84,670.00 | 1.0000 | 84,670.00 | 0.4319 | 36,569.43 | 1,650,969.66 |
| 2058/59 | 58 | 84,670.00 | 1.0000 | 84,670.00 | 0.4214 | 35,677.49 | 1,686,647.15 |
| 2059/60 | 59 | 84,670.00 | 0.2300 | 19,474.10 | 0.4111 | 8,005.68 | 1,694,652.83 |
| **Total (To Age 59.23)** | | | 35.2300 | 2,653,344.10 | | 1,694,652.83 | 1,694,652.83 |
| | | | | | | | |
| 2059/60 | 59 | 84,670.00 | 1.0000 | 84,670.00 | 0.4111 | 34,807.31 | 1,721,454.46 |
| 2060/61 | 60 | 84,670.00 | 1.0000 | 84,670.00 | 0.4011 | 33,958.35 | 1,755,412.80 |
| 2061/62 | 61 | 84,670.00 | 1.0000 | 84,670.00 | 0.3913 | 33,130.09 | 1,788,542.90 |
| 2062/63 | 62 | 84,670.00 | 1.0000 | 84,670.00 | 0.3817 | 32,322.04 | 1,820,864.94 |

TABLE 1

**ESTATE OF AUSTIN MADUBUIKE**
**CALCULATION OF HUMAN CAPITAL / EARNING CAPACITY**
**SCENARIO 1**

| Year | Age | Base Income | Year Fraction | Projected Income | Present Value Factor | Economic Loss | Cumulative Economic Loss |
|------|-----|-------------|---------------|------------------|----------------------|---------------|--------------------------|
| 2063/64 | 63 | 84,670.00 | 1.0000 | 84,670.00 | 0.3724 | 31,533.70 | 1,852,398.64 |
| 2064/65 | 64 | 84,670.00 | 1.0000 | 84,670.00 | 0.3633 | 30,764.59 | 1,883,163.23 |
| 2065/66 | 65 | 83,970.00 | 1.0000 | 83,970.00 | 0.3545 | 29,766.09 | 1,912,929.32 |
| 2066/67 | 66 | 83,970.00 | 1.0000 | 83,970.00 | 0.3458 | 29,040.09 | 1,941,969.41 |
| Total (To Age 67.00) | | | 43.0000 | $3,309,830.00 | | $1,941,969.41 | $  1,941,969.41 |

**TOTAL LOST EARNING CAPACITY (TO AGE 59.23)**          $ 1,694,652.83

**TOTAL LOST EARNING CAPACITY (TO AGE 67.00)**          $ 1,941,969.41

## ESTATE OF AUSTIN MADUBUIKE
### CALCULATION OF HUMAN CAPITAL / EARNING CAPACITY
### SCENARIO 2

| Year | Age | Base Income | Year Fraction | Projected Income | Present Value Factor | Economic Loss | Cumulative Economic Loss |
|------|-----|-------------|---------------|------------------|----------------------|---------------|--------------------------|
| **FUTURE:** | | | | | | | |
| 2024/25 | 24 | 60,240.00 | 1.0000 | 60,240.00 | 0.9756 | 58,770.73 | 58,770.73 |
| 2025/26 | 25 | 94,100.00 | 1.0000 | 94,100.00 | 0.9518 | 89,565.73 | 148,336.47 |
| 2026/27 | 26 | 94,100.00 | 1.0000 | 94,100.00 | 0.9286 | 87,381.20 | 235,717.67 |
| 2027/28 | 27 | 94,100.00 | 1.0000 | 94,100.00 | 0.9060 | 85,249.96 | 320,967.63 |
| 2028/29 | 28 | 94,100.00 | 1.0000 | 94,100.00 | 0.8839 | 83,170.69 | 404,138.32 |
| 2029/30 | 29 | 94,100.00 | 1.0000 | 94,100.00 | 0.8623 | 81,142.14 | 485,280.45 |
| 2030/31 | 30 | 94,100.00 | 1.0000 | 94,100.00 | 0.8413 | 79,163.06 | 564,443.51 |
| 2031/32 | 31 | 94,100.00 | 1.0000 | 94,100.00 | 0.8207 | 77,232.25 | 641,675.76 |
| 2032/33 | 32 | 94,100.00 | 1.0000 | 94,100.00 | 0.8007 | 75,348.54 | 717,024.30 |
| 2033/34 | 33 | 94,100.00 | 1.0000 | 94,100.00 | 0.7812 | 73,510.77 | 790,535.07 |
| 2034/35 | 34 | 94,100.00 | 1.0000 | 94,100.00 | 0.7621 | 71,717.82 | 862,252.89 |
| 2035/36 | 35 | 115,900.00 | 1.0000 | 115,900.00 | 0.7436 | 86,178.13 | 948,431.02 |
| 2036/37 | 36 | 115,900.00 | 1.0000 | 115,900.00 | 0.7254 | 84,076.22 | 1,032,507.24 |
| 2037/38 | 37 | 115,900.00 | 1.0000 | 115,900.00 | 0.7077 | 82,025.58 | 1,114,532.82 |
| 2038/39 | 38 | 115,900.00 | 1.0000 | 115,900.00 | 0.6905 | 80,024.96 | 1,194,557.78 |
| 2039/40 | 39 | 115,900.00 | 1.0000 | 115,900.00 | 0.6736 | 78,073.13 | 1,272,630.91 |
| 2040/41 | 40 | 115,900.00 | 1.0000 | 115,900.00 | 0.6572 | 76,168.91 | 1,348,799.82 |
| 2041/42 | 41 | 115,900.00 | 1.0000 | 115,900.00 | 0.6412 | 74,311.13 | 1,423,110.95 |
| 2042/43 | 42 | 115,900.00 | 1.0000 | 115,900.00 | 0.6255 | 72,498.66 | 1,495,609.61 |
| 2043/44 | 43 | 115,900.00 | 1.0000 | 115,900.00 | 0.6103 | 70,730.40 | 1,566,340.01 |
| 2044/45 | 44 | 115,900.00 | 1.0000 | 115,900.00 | 0.5954 | 69,005.27 | 1,635,345.28 |
| 2045/46 | 45 | 133,300.00 | 1.0000 | 133,300.00 | 0.5809 | 77,429.26 | 1,712,774.54 |
| 2046/47 | 46 | 133,300.00 | 1.0000 | 133,300.00 | 0.5667 | 75,540.74 | 1,788,315.29 |
| 2047/48 | 47 | 133,300.00 | 1.0000 | 133,300.00 | 0.5529 | 73,698.28 | 1,862,013.57 |
| 2048/49 | 48 | 133,300.00 | 1.0000 | 133,300.00 | 0.5394 | 71,900.77 | 1,933,914.34 |
| 2049/50 | 49 | 133,300.00 | 1.0000 | 133,300.00 | 0.5262 | 70,147.09 | 2,004,061.42 |
| 2050/51 | 50 | 133,300.00 | 1.0000 | 133,300.00 | 0.5134 | 68,436.18 | 2,072,497.61 |
| 2051/52 | 51 | 133,300.00 | 1.0000 | 133,300.00 | 0.5009 | 66,767.01 | 2,139,264.62 |
| 2052/53 | 52 | 133,300.00 | 1.0000 | 133,300.00 | 0.4887 | 65,138.54 | 2,204,403.16 |
| 2053/54 | 53 | 133,300.00 | 1.0000 | 133,300.00 | 0.4767 | 63,549.80 | 2,267,952.96 |
| 2054/55 | 54 | 133,300.00 | 1.0000 | 133,300.00 | 0.4651 | 61,999.80 | 2,329,952.77 |
| 2055/56 | 55 | 131,900.00 | 1.0000 | 131,900.00 | 0.4538 | 59,852.34 | 2,389,805.10 |
| 2056/56 | 56 | 131,900.00 | 1.0000 | 131,900.00 | 0.4427 | 58,392.52 | 2,448,197.62 |
| 2057/58 | 57 | 131,900.00 | 1.0000 | 131,900.00 | 0.4319 | 56,968.31 | 2,505,165.94 |
| 2058/59 | 58 | 131,900.00 | 1.0000 | 131,900.00 | 0.4214 | 55,578.84 | 2,560,744.78 |
| 2059/60 | 59 | 131,900.00 | 1.0000 | 131,900.00 | 0.4111 | 54,223.26 | 2,614,968.04 |
| 2060/61 | 60 | 131,900.00 | 1.0000 | 131,900.00 | 0.4011 | 52,900.74 | 2,667,868.79 |
| 2061/62 | 61 | 131,900.00 | 1.0000 | 131,900.00 | 0.3913 | 51,610.48 | 2,719,479.27 |
| 2062/63 | 62 | 131,900.00 | 0.9200 | 121,348.00 | 0.3817 | 46,323.55 | 2,765,802.82 |
| **Total (To Age 62.92)** | | | 38.9200 | 4,537,888.00 | | 2,765,802.82 | 2,765,802.82 |

### ESTATE OF AUSTIN MADUBUIKE
### CALCULATION OF HUMAN CAPITAL / EARNING CAPACITY
### SCENARIO 2

| Year | Age | Base Income | Year Fraction | Projected Income | Present Value Factor | Economic Loss | Cumulative Economic Loss |
|---|---|---|---|---|---|---|---|
| 2062/63 | 62 | 131,900.00 | 1.0000 | 131,900.00 | 0.3817 | 50,351.69 | 2,769,830.96 |
| 2063/64 | 63 | 131,900.00 | 1.0000 | 131,900.00 | 0.3724 | 49,123.60 | 2,818,954.56 |
| 2064/65 | 64 | 131,900.00 | 1.0000 | 131,900.00 | 0.3633 | 47,925.46 | 2,866,880.02 |
| 2065/66 | 65 | 126,400.00 | 1.0000 | 126,400.00 | 0.3545 | 44,806.88 | 2,911,686.90 |
| 2066/67 | 66 | 126,400.00 | 1.0000 | 126,400.00 | 0.3458 | 43,714.03 | 2,955,400.94 |
| Total (To Age 67.00) | | | 43.0000 | $4,273,640.00 | | $ 2,625,726.77 | $   2,955,400.94 |

**TOTAL LOST EARNING CAPACITY (TO AGE 62.92)**          $2,765,802.82

**TOTAL LOST EARNING CAPACITY (TO AGE 67.00)**          $2,955,400.94

TABLE 3

**ESTATE OF AUSTIN MADUBUIKE**
**CALCULATION OF HUMAN CAPITAL / EARNING CAPACITY**
**SCENARIO 3**

| Year | Age | Base Income | Year Fraction | Projected Income | Present Value Factor | Economic Loss | Cumulative Economic Loss |
|------|-----|-------------|---------------|------------------|---------------------|---------------|--------------------------|
| FUTURE: | | | | | | | |
| 2024/25 | 24 | $        - | 0.0000 | $        - | 0.9756 | $        - | $        - |
| 2025/26 | 25 |          - | 0.0000 |          - | 0.9518 |          - |          - |
| 2026/27 | 26 | 98,030.00 | 1.0000 | 98,030.00 | 0.9286 | 91,030.60 | 91,030.60 |
| 2027/28 | 27 | 98,030.00 | 1.0000 | 98,030.00 | 0.9060 | 88,810.34 | 179,840.94 |
| 2028/29 | 28 | 98,030.00 | 1.0000 | 98,030.00 | 0.8839 | 86,644.24 | 266,485.18 |
| 2029/30 | 29 | 98,030.00 | 1.0000 | 98,030.00 | 0.8623 | 84,530.96 | 351,016.14 |
| 2030/31 | 30 | 98,030.00 | 1.0000 | 98,030.00 | 0.8413 | 82,469.23 | 433,485.37 |
| 2031/32 | 31 | 98,030.00 | 1.0000 | 98,030.00 | 0.8207 | 80,457.79 | 513,943.16 |
| 2032/33 | 32 | 98,030.00 | 1.0000 | 98,030.00 | 0.8007 | 78,495.40 | 592,438.56 |
| 2033/34 | 33 | 98,030.00 | 1.0000 | 98,030.00 | 0.7812 | 76,580.88 | 669,019.44 |
| 2034/35 | 34 | 98,030.00 | 1.0000 | 98,030.00 | 0.7621 | 74,713.05 | 743,732.49 |
| 2035/36 | 35 | 145,760.00 | 1.0000 | 145,760.00 | 0.7436 | 108,380.71 | 852,113.20 |
| 2036/37 | 36 | 145,760.00 | 1.0000 | 145,760.00 | 0.7254 | 105,737.27 | 957,850.47 |
| 2037/38 | 37 | 145,760.00 | 1.0000 | 145,760.00 | 0.7077 | 103,158.32 | 1,061,008.79 |
| 2038/39 | 38 | 145,760.00 | 1.0000 | 145,760.00 | 0.6905 | 100,642.26 | 1,161,651.05 |
| 2039/40 | 39 | 145,760.00 | 1.0000 | 145,760.00 | 0.6736 | 98,187.57 | 1,259,838.62 |
| 2040/41 | 40 | 145,760.00 | 1.0000 | 145,760.00 | 0.6572 | 95,792.75 | 1,355,631.37 |
| 2041/42 | 41 | 145,760.00 | 1.0000 | 145,760.00 | 0.6412 | 93,456.34 | 1,449,087.71 |
| 2042/43 | 42 | 145,760.00 | 1.0000 | 145,760.00 | 0.6255 | 91,176.92 | 1,540,264.63 |
| 2043/44 | 43 | 145,760.00 | 1.0000 | 145,760.00 | 0.6103 | 88,953.09 | 1,629,217.72 |
| 2044/45 | 44 | 145,760.00 | 1.0000 | 145,760.00 | 0.5954 | 86,783.51 | 1,716,001.23 |
| 2045/46 | 45 | 145,760.00 | 1.0000 | 145,760.00 | 0.5809 | 84,666.83 | 1,800,668.06 |
| 2046/47 | 46 | 145,760.00 | 1.0000 | 145,760.00 | 0.5667 | 82,601.79 | 1,883,269.85 |
| 2047/48 | 47 | 145,760.00 | 1.0000 | 145,760.00 | 0.5529 | 80,587.11 | 1,963,856.96 |
| 2048/49 | 48 | 145,760.00 | 1.0000 | 145,760.00 | 0.5394 | 78,621.54 | 2,042,478.54 |
| 2049/50 | 49 | 145,760.00 | 1.0000 | 145,760.00 | 0.5262 | 76,703.97 | 2,119,182.51 |
| 2050/51 | 50 | 145,760.00 | 1.0000 | 145,760.00 | 0.5134 | 74,833.14 | 2,194,015.65 |
| 2051/52 | 51 | 145,760.00 | 1.0000 | 145,760.00 | 0.5009 | 73,007.95 | 2,267,023.60 |
| 2052/53 | 52 | 145,760.00 | 1.0000 | 145,760.00 | 0.4887 | 71,227.26 | 2,338,250.86 |
| 2053/54 | 53 | 145,760.00 | 1.0000 | 145,760.00 | 0.4767 | 69,490.01 | 2,407,740.88 |
| 2054/55 | 54 | 145,760.00 | 1.0000 | 145,760.00 | 0.4651 | 67,795.14 | 2,475,536.01 |
| 2055/56 | 55 | 217,360.00 | 1.0000 | 217,360.00 | 0.4538 | 98,631.57 | 2,574,167.58 |
| 2056/56 | 56 | 217,360.00 | 1.0000 | 217,360.00 | 0.4427 | 96,225.92 | 2,670,393.50 |
| 2057/58 | 57 | 217,360.00 | 1.0000 | 217,360.00 | 0.4319 | 93,878.95 | 2,764,272.44 |
| 2058/59 | 58 | 217,360.00 | 1.0000 | 217,360.00 | 0.4214 | 91,589.21 | 2,855,861.66 |
| 2059/60 | 59 | 217,360.00 | 1.0000 | 217,360.00 | 0.4111 | 89,355.33 | 2,945,216.99 |
| 2060/61 | 60 | 217,360.00 | 1.0000 | 217,360.00 | 0.4011 | 87,175.93 | 3,032,392.92 |
| 2061/62 | 61 | 217,360.00 | 1.0000 | 217,360.00 | 0.3913 | 85,049.69 | 3,117,442.61 |
| 2062/63 | 62 | 217,360.00 | 1.0000 | 217,360.00 | 0.3817 | 82,975.31 | 3,200,417.92 |
| 2063/64 | 63 | 217,360.00 | 1.0000 | 217,360.00 | 0.3724 | 80,951.52 | 3,281,369.44 |
| 2064/65 | 64 | 217,360.00 | 1.0000 | 217,360.00 | 0.3633 | 78,977.09 | 3,360,346.54 |

TABLE 3

**ESTATE OF AUSTIN MADUBUIKE**
**CALCULATION OF HUMAN CAPITAL / EARNING CAPACITY**
**SCENARIO 3**

| Year | Age | Base Income | Year Fraction | Projected Income | Present Value Factor | Economic Loss | Cumulative Economic Loss |
|------|-----|-------------|---------------|------------------|----------------------|---------------|--------------------------|
| 2065/66 | 65 | 217,360.00 | 1.0000 | 217,360.00 | 0.3545 | 77,050.82 | 3,437,397.36 |
| 2066/67 | 66 | 217,360.00 | 0.1600 | 34,777.60 | 0.3458 | 12,027.45 | 3,449,424.80 |
| Total (To Age 66.16) | | | 40.1600 | 6,223,207.60 | | 3,449,424.80 | 3,449,424.80 |
| | | | | | | | |
| 2066/67 | 66 | 217,360.00 | 1.0000 | 217,360.00 | 0.3458 | 75,171.53 | 3,512,568.89 |
| Total (To Age 67.00) | | | 41.0000 | $6,405,790.00 | | $ 3,512,568.89 | $   3,512,568.89 |

**TOTAL LOST EARNING CAPACITY (TO AGE 66.16)**          **$3,449,424.80**

**TOTAL LOST EARNING CAPACITY (TO AGE 67.00)**          **$3,512,568.89**

TABLE 4

**ESTATE OF AUSTIN MADUBUIKE**
**SUMMARY OF ECONOMIC LOSS**

| LOSS OF LIFE | Scenario 1 | | Scenario 2 | | Scenario 3 | |
|---|---|---|---|---|---|---|
| | To Age 59.23 | To Age 67.00 | To Age 62.92 | To Age 67.00 | To Age 66.16 | To Age 67.00 |
| **HUMAN CAPITAL** | | | | | | |
| Lost Earning Capacity | $1,694,652.83 | $1,941,969.41 | $2,765,802.82 | $2,955,400.94 | $3,449,424.80 | $3,512,568.89 |
| Fringe Benefits | 508,395.85 | 582,590.82 | 829,740.85 | 886,620.28 | 1,034,827.44 | 1,053,770.67 |
| Total Human Capital | 2,203,048.68 | 2,524,560.23 | 3,595,543.67 | 3,842,021.22 | 4,484,252.25 | 4,566,339.56 |
| RESIDUAL VALUE OF LIFE IN EXCESS OF EARNING CAPACITY | To Be Determined | | To Be Determined | | To Be Determined | |

X   56.2   =

Annual       Life
Value     Expectancy

| TOTAL LOSS OF LIFE | $2,203,048.68 + | $2,524,560.23 + | $3,595,543.67 + | $3,842,021.22 + | $4,484,252.25 + | $4,566,339.56 + |

TABLE 5

**ESTATE OF AUSTIN MADUBUIKE**
**SUMMARY OF ECONOMIC LOSS**

| LOSS OF LIFE | Scenario 1 | | Scenario 2 | | Scenario 3 | |
|---|---|---|---|---|---|---|
| | To Age 59.23 | To Age 67.00 | To Age 62.92 | To Age 67.00 | To Age 66.16 | To Age 67.00 |
| **HUMAN CAPITAL** | | | | | | |
| Lost Earning Capacity | $ 1,694,652.83 | $ 1,941,969.41 | $2,765,802.82 | $2,955,400.94 | $3,449,424.80 | $3,512,568.89 |
| Fringe Benefits | 508,395.85 | 582,590.82 | 829,740.85 | 886,620.28 | 1,034,827.44 | 1,053,770.67 |
| Total Human Capital | 2,203,048.68 | 2,524,560.23 | 3,595,543.67 | 3,842,021.22 | 4,484,252.25 | 4,566,339.56 |
| **RESIDUAL VALUE OF LIFE IN EXCESS OF EARNING CAPACITY** | To Be Determined | | To Be Determined | | To Be Determined | |

_____  X    56.2    X    0.5675    =

| Annual | Life | Present |
| Value | Expectancy | Value |
| | | Factor |

**TOTAL LOSS OF LIFE**    $ 2,203,048.68  +  $  2,524,560.23  +  $3,595,543.67  +  $3,842,021.22  +  $4,484,252.25  +  $4,566,339.56  +

## UNITED STATES GOVERNMENT AGENCIES
## STATISTICAL VALUE OF LIFE

| Agency | Date | Value | Inflation Factor | Adjusted Value | Life Expectancy | Implicit Annual Value |
|---|---|---|---|---|---|---|
| Department of Transportation | 2016 | $ 9,600,000 | 1.2696 | $ 12,187,725 | 42.00 | $ 290,184 |
| Environmental Protection Agency | 2006 | $ 7,400,000 | 1.5114 | $ 11,184,498 | 42.00 | $ 266,298 |
| Office of Management and Budget | 2001* | $ 1,000,000 | 1.7205 | $ 1,720,508 | 42.00 | $ 40,964 |
| | 2001* | $ 10,000,000 | 1.7205 | $ 17,205,082 | 42.00 | $ 409,645 |
| | 2010** | $ 6,700,000 | 1.3974 | $ 9,362,290 | 42.00 | $ 222,912 |
| Department of Homeland Security | 2008 | $ 6,300,000 | 1.4152 | $ 8,915,912 | 42.00 | $ 212,284 |
| Occupational Safety and Health Administration | 2010 | $ 8,700,000 | 1.3974 | $ 12,157,003 | 42.00 | $ 289,452 |
| Food and Drug Administration | 2002* | $ 5,000,000 | 1.6937 | $ 8,468,649 | 42.00 | $ 201,635 |
| | 2002* | $ 6,500,000 | 1.6937 | $ 11,009,244 | 42.00 | $ 262,125 |
| Consumer Product Safety Commission | 2010 | $ 5,000,000 | 1.3974 | $ 6,986,783 | 42.00 | $ 166,352 |
| Federal Aviation Administration | 2010 | $ 6,000,000 | 1.3974 | $ 8,384,140 | 42.00 | $ 199,622 |

# ECONOMIC AND FINANCIAL CONSULTING GROUP, INC.

6 RICHLAND HILLS COVE • CONWAY, AR  72034 • (501) 450-1306

November 25, 2024

Dortch Lindstrom Livingston Law Group
4306 Yoakum Blvd., Suite 270
Houston, TX 77006

RE:  **Estate of Austin Madubuike**

Dear Mr. Lindstrom:

As you know, in a recent Arkansas wrongful death case, *Estate of Jerry R. Kolpek v. United States of America* (Western District of Arkansas: 5:21-CV-05116), Judge Timothy Brooks awarded the plaintiff an amount of $1,600,000.00 for Loss of Life Damages. The decedent in that matter, Jerry R. Kolpeck, was 83 years old at the time of his death and had a life expectancy of 6.50 additional years according to Judge Brooks' opinion. Judge Brooks' award translates into an implicit annual amount of approximately $246,000.00 in nominal terms. A larger annual amount would be necessary to attain Judge Brooks' award amount in present value terms.

At your request, I have performed additional computations in the above-cited matter. Specifically, I have calculated the nominal and present values of a payment of $246,000.00 per year projected over the statistical life expectancy of the decedent in accordance with my usual methodology. Those computations yield nominal and present values of **$13,559,789.59** and **$8,225,630.91**, respectively. Present value is calculated in accordance with standard financial formulas utilizing a 2.50% real interest rate. My computations are projected over a life expectancy of 75.80 years based on the Center for Disease Control publication: *United States Life Tables, 2019*. My computations are presented on a year-by-year basis in the attached table.

If I can be of further service in this matter, please do not hesitate to contact me.

Yours very truly,

*Ralph D. Scott, Jr.*

RALPH D. SCOTT, JR., Ph.D.

## CALCULATION OF NOMINAL AND PRESENT VALUES
### PAYMENT AMOUNT: $246,000.00 PER YEAR

| Year | Base Amount | Year Fraction | Projected Value | Present Value Factor | Present Value | Cumulative Present Value |
|------|-------------|---------------|-----------------|----------------------|---------------|--------------------------|
| **PAST:** | | | | | | |
| 2022 | $ 246,000.00 | 0.3836 | $ 94,356.16 | 1.0000 | $ 94,356.16 | 94,356.16 |
| 2023 | 246,000.00 | 1.0000 | 246,000.00 | 1.0000 | 246,000.00 | 340,356.16 |
| 2024 | 246,000.00 | 0.0575 | 14,153.42 | 1.0000 | 14,153.42 | 354,509.59 |
| Total | | 1.4411 | 354,509.59 | | 354,509.59 | 354,509.59 |
| | | | | | | |
| **FUTURE:** | | | | | | |
| | | | | | | |
| 2024/25 | 246,000.00 | 1.0000 | 246,000.00 | 0.9756 | 240,000.00 | 240,000.00 |
| 2025/26 | 246,000.00 | 1.0000 | 246,000.00 | 0.9518 | 234,146.34 | 474,146.34 |
| 2026/27 | 246,000.00 | 1.0000 | 246,000.00 | 0.9286 | 228,435.46 | 702,581.80 |
| 2027/28 | 246,000.00 | 1.0000 | 246,000.00 | 0.9060 | 222,863.86 | 925,445.66 |
| 2028/29 | 246,000.00 | 1.0000 | 246,000.00 | 0.8839 | 217,428.15 | 1,142,873.81 |
| 2029/30 | 246,000.00 | 1.0000 | 246,000.00 | 0.8623 | 212,125.03 | 1,354,998.84 |
| 2030/31 | 246,000.00 | 1.0000 | 246,000.00 | 0.8413 | 206,951.25 | 1,561,950.09 |
| 2031/32 | 246,000.00 | 1.0000 | 246,000.00 | 0.8207 | 201,903.66 | 1,763,853.74 |
| 2032/33 | 246,000.00 | 1.0000 | 246,000.00 | 0.8007 | 196,979.18 | 1,960,832.92 |
| 2033/34 | 246,000.00 | 1.0000 | 246,000.00 | 0.7812 | 192,174.81 | 2,153,007.73 |
| 2034/35 | 246,000.00 | 1.0000 | 246,000.00 | 0.7621 | 187,487.62 | 2,340,495.34 |
| 2035/36 | 246,000.00 | 1.0000 | 246,000.00 | 0.7436 | 182,914.75 | 2,523,410.09 |
| 2036/37 | 246,000.00 | 1.0000 | 246,000.00 | 0.7254 | 178,453.41 | 2,701,863.50 |
| 2037/38 | 246,000.00 | 1.0000 | 246,000.00 | 0.7077 | 174,100.89 | 2,875,964.39 |
| 2038/39 | 246,000.00 | 1.0000 | 246,000.00 | 0.6905 | 169,854.53 | 3,045,818.92 |
| 2039/40 | 246,000.00 | 1.0000 | 246,000.00 | 0.6736 | 165,711.73 | 3,211,530.65 |
| 2040/41 | 246,000.00 | 1.0000 | 246,000.00 | 0.6572 | 161,669.98 | 3,373,200.64 |
| 2041/42 | 246,000.00 | 1.0000 | 246,000.00 | 0.6412 | 157,726.81 | 3,530,927.45 |
| 2042/43 | 246,000.00 | 1.0000 | 246,000.00 | 0.6255 | 153,879.82 | 3,684,807.27 |
| 2043/44 | 246,000.00 | 1.0000 | 246,000.00 | 0.6103 | 150,126.65 | 3,834,933.92 |
| 2044/45 | 246,000.00 | 1.0000 | 246,000.00 | 0.5954 | 146,465.03 | 3,981,398.95 |
| 2045/46 | 246,000.00 | 1.0000 | 246,000.00 | 0.5809 | 142,892.71 | 4,124,291.66 |
| 2046/47 | 246,000.00 | 1.0000 | 246,000.00 | 0.5667 | 139,407.52 | 4,263,699.18 |
| 2047/48 | 246,000.00 | 1.0000 | 246,000.00 | 0.5529 | 136,007.34 | 4,399,706.51 |
| 2048/49 | 246,000.00 | 1.0000 | 246,000.00 | 0.5394 | 132,690.09 | 4,532,396.60 |
| 2049/50 | 246,000.00 | 1.0000 | 246,000.00 | 0.5262 | 129,453.74 | 4,661,850.34 |
| 2050/51 | 246,000.00 | 1.0000 | 246,000.00 | 0.5134 | 126,296.33 | 4,788,146.67 |
| 2051/52 | 246,000.00 | 1.0000 | 246,000.00 | 0.5009 | 123,215.93 | 4,911,362.61 |
| 2052/53 | 246,000.00 | 1.0000 | 246,000.00 | 0.4887 | 120,210.67 | 5,031,573.28 |
| 2053/54 | 246,000.00 | 1.0000 | 246,000.00 | 0.4767 | 117,278.70 | 5,148,851.98 |
| 2054/55 | 246,000.00 | 1.0000 | 246,000.00 | 0.4651 | 114,418.24 | 5,263,270.22 |
| 2055/56 | 246,000.00 | 1.0000 | 246,000.00 | 0.4538 | 111,627.56 | 5,374,897.78 |
| 2056/56 | 246,000.00 | 1.0000 | 246,000.00 | 0.4427 | 108,904.93 | 5,483,802.71 |
| 2057/58 | 246,000.00 | 1.0000 | 246,000.00 | 0.4319 | 106,248.71 | 5,590,051.42 |
| 2058/59 | 246,000.00 | 1.0000 | 246,000.00 | 0.4214 | 103,657.28 | 5,693,708.71 |

**CALCULATION OF NOMINAL AND PRESENT VALUES**
**PAYMENT AMOUNT: $246,000.00 PER YEAR**

| Year | Base Amount | Year Fraction | Projected Value | Present Value Factor | Present Value | Cumulative Present Value |
|------|------------|---------------|-----------------|----------------------|---------------|--------------------------|
| 2059/60 | 246,000.00 | 1.0000 | 246,000.00 | 0.4111 | 101,129.06 | 5,794,837.76 |
| 2060/61 | 246,000.00 | 1.0000 | 246,000.00 | 0.4011 | 98,662.49 | 5,893,500.26 |
| 2061/62 | 246,000.00 | 1.0000 | 246,000.00 | 0.3913 | 96,256.09 | 5,989,756.35 |
| 2062/63 | 246,000.00 | 1.0000 | 246,000.00 | 0.3817 | 93,908.38 | 6,083,664.73 |
| 2063/64 | 246,000.00 | 1.0000 | 246,000.00 | 0.3724 | 91,617.93 | 6,175,282.66 |
| 2064/65 | 246,000.00 | 1.0000 | 246,000.00 | 0.3633 | 89,383.35 | 6,264,666.01 |
| 2065/66 | 246,000.00 | 1.0000 | 246,000.00 | 0.3545 | 87,203.27 | 6,351,869.28 |
| 2066/67 | 246,000.00 | 1.0000 | 246,000.00 | 0.3458 | 85,076.36 | 6,436,945.64 |
| 2067/68 | 246,000.00 | 1.0000 | 246,000.00 | 0.3374 | 83,001.33 | 6,519,946.97 |
| 2068/69 | 246,000.00 | 1.0000 | 246,000.00 | 0.3292 | 80,976.90 | 6,600,923.87 |
| 2069/70 | 246,000.00 | 1.0000 | 246,000.00 | 0.3211 | 79,001.86 | 6,679,925.73 |
| 2070/71 | 246,000.00 | 1.0000 | 246,000.00 | 0.3133 | 77,074.98 | 6,757,000.71 |
| 2071/72 | 246,000.00 | 1.0000 | 246,000.00 | 0.3057 | 75,195.10 | 6,832,195.81 |
| 2072/73 | 246,000.00 | 1.0000 | 246,000.00 | 0.2982 | 73,361.08 | 6,905,556.89 |
| 2073/74 | 246,000.00 | 1.0000 | 246,000.00 | 0.2909 | 71,571.78 | 6,977,128.67 |
| 2074/75 | 246,000.00 | 1.0000 | 246,000.00 | 0.2838 | 69,826.13 | 7,046,954.80 |
| 2075/76 | 246,000.00 | 1.0000 | 246,000.00 | 0.2769 | 68,123.05 | 7,115,077.86 |
| 2076/77 | 246,000.00 | 1.0000 | 246,000.00 | 0.2702 | 66,461.52 | 7,181,539.37 |
| 2077/78 | 246,000.00 | 0.6800 | 167,280.00 | 0.2636 | 44,091.54 | 7,225,630.91 |
| Total | | 53.6800 | $ 13,205,280.00 | | $ 7,225,630.91 | $ 7,225,630.91 |

**TOTAL: NOMINAL VALUE**  $ 13,559,789.59

**TOTAL: PRESENT VALUE**  $ 7,225,630.91



**U.S. Department of
Transportation**
Office of the Secretary
Of Transportation

1200 New Jersey Ave , S E.
Washington, DC 20590

August 8, 2016

MEMORANDUM TO:    SECRETARIAL OFFICERS
                  MODAL ADMINISTRATORS

From:             Molly J. Moran
                  Acting General Counsel, x64702

                  Carlos Monje
                  Assistant Secretary for Transportation Policy, x60396

Subject:          Guidance on Treatment of the Economic Value of a Statistical Life
                  (VSL) in U.S. Department of Transportation Analyses – 2016 Adjustment

Departmental guidance on valuing the reduction of fatalities and injuries by regulations or
investments has been published periodically by this office since 1993. We issued a thorough
revision of our guidance in 2013 and indicated that we planned to issue annual updates to adjust
for changes in prices and real incomes since then.

Our 2013 revision indicated a VSL of $9.1 million in current dollars for analyses using a base
year of 2012, which was updated to $9.4 million in the 2015 guidance for analyses using a base
year of 2014. Using the 2015 value as a baseline, and taking into account both changes in prices
and changes in real incomes, we now find that these changes over the past year result in an
increased VSL of $9.6 million for analyses prepared in 2016. The procedure for adjusting VSL
for changes in prices and real incomes is described on pages 8-9 of the guidance.

This guidance also includes a table of the relative values of preventing injuries of varied severity
as a fraction of the VSL; these fractions remain unchanged since the 2013 guidance. We also
prescribe a sensitivity analysis of the effects of using alternative VSL values. Instead of treating
alternative values in terms of a probability distribution, analysts should apply only a test of low
and high alternative values of $5.4 million and $13.4 million (in 2015 dollars).

This guidance and other relevant documents will be posted on the Office of Transportation
Policy website, http://www.dot.gov/policy/transportation-policy/economy , and on the General
Counsel's regulatory information website, http://www.transportation.gov/regulations. Questions
should be addressed to Darren Timothy. (202) 366-4051 or darren.timothy@dot.gov.

cc: Regulations officers and liaison officers

### Revised Departmental Guidance 2016:

### Treatment of the Value of Preventing Fatalities and Injuries in Preparing Economic Analyses

On the basis of the best available evidence, this guidance identifies $9.6 million as the value of a statistical life to be used for Department of Transportation analyses assessing the benefits of preventing fatalities and using a base year of 2015. It also establishes policies for assigning comparable values to prevention of injuries.

<u>Background</u>

Prevention of injury, illness, and loss of life is a significant factor in many private economic decisions, including job choices and consumer product purchases. When government makes direct investments or controls external market impacts by regulation, it also pursues these benefits, often while also imposing costs on society. The Office of the Secretary of Transportation and other DOT administrations are required by Executive Order 13563, Executive Order 12866, Executive Order 12893, OMB Circular A-4, and DOT Order 2100.5 to evaluate in monetary terms the costs and benefits of their regulations, investments, and administrative actions, in order to demonstrate the faithful execution of their responsibilities to the public. Since 1993, the Office of the Secretary of Transportation has periodically reviewed the published research on the value of safety and updated guidance for all administrations. Our previous guidance revision, issued on February 28, 2013, stated that we planned to update our guidance annually to adjust for changes in prices and real incomes. This guidance updates our values based on 2015 prices and real incomes.

The benefit of preventing a fatality is measured by what is conventionally called the Value of a Statistical Life (VSL), defined as the additional cost that individuals would be willing to bear for improvements in safety (that is, reductions in risks) that, in the aggregate, reduce the expected number of fatalities by one. This conventional terminology has often provoked misunderstanding on the part of both the public and decision-makers. What is involved is not the valuation of life as such, but the valuation of reductions in risks. While new terms have been proposed to avoid misunderstanding, we will maintain the common usage of the research literature and OMB Circular A-4 in referring to VSL.

Most regulatory actions involve the reduction of risks of low probability (as in, for example, a one-in-10,000 annual chance of dying in an automobile crash). For these low-probability risks, we shall assume that the willingness to pay to avoid the risk of a fatal injury increases proportionately with growing risk. That is, when an individual is willing to pay $1,000 to reduce the annual risk of death by one in 10,000, she is said to have a VSL of $10 million. The assumption of a linear relationship between risk and willingness to pay therefore implies that she would be willing to pay $2,000 to reduce risk by two in 10,000 or $5,000 to reduce risk by five in 10,000. The assumption of a linear relationship between risk and willingness to pay (WTP) breaks down when the annual WTP becomes a substantial portion of annual income, so the assumption of a constant VSL is not appropriate for substantially larger risks.

When first applied to benefit-cost analysis in the 1960s and 1970s, the value of saving a life was measured by the potential victim's expected earnings, measuring the additional product society might have lost. These lost earnings were widely believed to understate the real costs of loss of life, because the value that we place on the continued life of our family and friends is not based entirely, or even principally, on their earning capacity. In recent decades, studies based on estimates of individuals' willingness to pay for improved safety have become widespread, and offer a way of measuring the value of reduced risk in a more comprehensive way. These estimates of the individual's value of safety are then treated as the ratio of the individual marginal utility of safety to the marginal utility of wealth. These estimates of the individual values of changes in safety can then be aggregated to produce estimates of social benefits of changes in safety, which can then be compared with the costs of these changes.

Studies estimating the willingness to pay for safety fall into two categories. Some analyze subjects' responses in real markets, and are referred to as revealed preference (RP) studies, while others analyze subjects' responses in hypothetical markets, and are described as stated preference (SP) studies. Revealed preference studies in turn can be divided into studies based on consumer purchase decisions and studies based on employment decisions (usually referred to as hedonic wage studies). Even in revealed preference studies, safety is not purchased directly, so the value that consumers place upon it cannot be measured directly. Instead, the value of safety can be inferred from market decisions that people make in which safety is one factor in their decisions. In the case of consumer purchase decisions, since goods and services usually display multiple attributes, and are purchased for a variety of reasons, there is no guarantee that safety will be the conclusive factor in any purchasing decision (note that even products like bicycle helmets, which are purchased primarily for safety, also vary in style, comfort, and durability). Similarly, in employment decisions, safety is one of many considerations in the decision of which job offer to accept. Statistical techniques must therefore be used to identify the relative influence of price (or wage), safety, and other qualitative characteristics of the product or job on the consumer's or worker's decision on which product to buy or which job to accept.

An additional complication in RP studies is that, even if the real risks confronted by individuals can be estimated accurately by the analyst, the consumer or employee may not estimate these risks accurately. It is possible for individuals, through lack of relevant information or limited ability to analyze risks, to assign an excessively low or high probability to fatal risks. Alternatively, detailed familiarity with the hazards they face and their own skills may allow individuals to form more accurate estimates of risk at, for example, a particular job-site than those derived by researchers, which inevitably are based on more aggregate data.

In the SP approach, market alternatives incorporating hypothetical risks are presented to test subjects, who respond with what they believe would be their choices. Answers to hypothetical questions may provide helpful information, but they remain hypothetical. Although great pains are usually taken to communicate probabilities and measure the subjects' understanding, there is no assurance that individuals' predictions of their own behavior would be observed in practice. Against this weakness, the SP method can evaluate many more alternatives than those for which market data are available, and it can guarantee that risks are described objectively to subjects. With indefinitely large potential variations in cost and risk and no uncontrolled variation in any

2

other dimension, some of the objections to RP models are obviated. Despite procedural safeguards, however, SP studies have not proven consistently successful in estimating measures of WTP that increase proportionally with greater risks.

RP studies involving decisions to buy and/or use various consumer products have focused on decisions such as buying cars with better safety equipment, wearing seat belts or helmets, or buying and installing smoke detectors. These studies often lack a continuum of price-risk opportunities, so that the price paid for a safety feature (such as a bicycle helmet) does not necessarily represent the value that the consumer places on the improvement in safety that the helmet provides. In the case of decisions to use a product (like a seatbelt) rather than to buy the product, the "price" paid by the consumer must be inferred from the amount of time and degree of inconvenience involved in using the product, rather than the directly observable price of buying the product. The necessity of making these inferences introduces possible sources of error. Studies of purchases of automobiles probably are less subject to these problems than studies of other consumer decisions, because the price of the safety equipment is directly observable, and there are usually a variety of more or less expensive safety features that provide more of a range of price-risk trade-offs for consumers to make.

While there are many examples of SP studies and RP studies involving consumer product purchases, the most widely cited body of research comprises hedonic wage studies, which estimate the wage differential that employers must pay workers to accept riskier jobs, taking other factors into account. Besides the problem of identifying and quantifying these factors, researchers must have a reliable source of data on fatality and injury risks and also assume that workers' psychological risk assessment conforms to the objective data. The accuracy of hedonic wage studies has improved over the last decade with the availability of more complete data from the Bureau of Labor Statistics' (BLS) Census of Fatal Occupational Injuries (CFOI), supported by advances in econometric modeling, including the use of panel data from the Panel Study of Income Dynamics (PSID). The CFOI data are, first of all, a complete census of occupational fatalities, rather than a sample, so they allow more robust statistical estimation. Second, they classify occupational fatalities by both industry and occupation, allowing variations in fatalities across both dimensions to be compared with corresponding variations in wage rates. Some of the new studies use panel data to analyze the behavior of workers who switch from one job to another, where the analysis can safely assume that any trade-off between wage levels and risk reflects the preferences of a single individual, and not differences in preferences among individuals.

VSL estimates are based on studies of groups of individuals that are covered by the study, but those VSL estimates are then applied to other groups of individuals who were not the subjects of the original studies. This process is called benefit transfer. One issue that has arisen in studies of VSL is whether this benefit transfer process should be applied broadly over the general population of people that are affected by a rulemaking, or whether VSL should be estimated for particular subgroups, such as workers in particular industries, and people of particular ages, races, and genders. Advances in data and econometric techniques have allowed specialized estimates of VSL for these population subgroups. Safety regulations issued by the Department of Transportation typically affect a broad cross-section of people, rather than more

3

narrowly defined subgroups. For that, and other policy reasons, we do not consider variations
in VSL among different population groups in this guidance.

### Principles and policies of DOT guidance

This guidance for the conduct of Department of Transportation analyses is a synthesis of
empirical estimates, practical adaptations, and social policies. We continue to explore new
empirical literature as it appears and to give further consideration to the policy resolutions
embodied in this guidance. Although our current approach is unchanged from previous
guidance, the numbers and their sources are new, consistent with OMB guidance in Circular A-
4 and with the use of the best available evidence. The methods we adopt are:

1. Prevention of an expected fatality is assigned a single, nationwide value in each year,
   regardless of the age, income, or other distinct characteristics of the affected population,
   the mode of travel, or the nature of the risk. When Departmental actions have distinct
   impacts on infants, disabled passengers, or the elderly, no adjustment to VSL should be
   made, but analysts should call the attention of decision-makers to the special character of
   the beneficiaries.
2. The value to be used by all DOT administrations will be published annually by the Office
   of the Secretary of Transportation.
3. Alternative high and low benefit estimates should be prepared, using a range of VSLs
   prescribed on pages 11-12 of this guidance

### 2008 VSL Guidance Update

In Circular A-4 (2003), the Office of Management and Budget endorsed VSL values between
$1 million and $10 million[1], drawing on two then recently completed VSL meta-analyses.[2] .
The basis for our 2008 guidance comprised five studies, four of which were meta-analyses that
synthesized many primary studies, identifying their sources of variation and estimating the most
likely common parameters. These studies were written by Ted R. Miller;[3] Ikuho Kochi, Bryan
Hubbell, and Randall Kramer;[4] W. Kip Viscusi;[5] Janusz R. Mrozek and Laura O. Taylor;[6] and
W. Kip Viscusi and Joseph Aldy.[7] They narrowed VSL estimates to the $2 million to $7
million range in dollar values of the original data, between 1995 and 2000 (about $3 million to

---

[1] In 2015 dollars, these values would be between $1.3 million and $13 million.
[2] Viscusi, W. K. and J.E. Aldy (2003). "The Value of a Statistical Life: A Critical Review of Market Estimates
Throughout the World." *Journal of Risk and Uncertainty*, 27(1): 5-76; and Mrozek, J.R. and L. O. Taylor (2002).
"What Determines the Value of a Life? A Meta-Analysis." *Journal of Policy Analysis and Management*. 21(2).
[3] Miller, T. R. (2000). "Variations between Countries in Values of Statistical Life." *Journal of Transport Economics
and Policy*. 34(2): 169-188. http://www.bath.ac.uk/e-journals/jtep/pdf/Volume_34_Part_2_169-188.pdf
[4] Kochi, I., B. Hubbell, and R. Kramer (2006). "An Empirical Bayes Approach to Combining and Comparing
Estimates of the Value of a Statistical Life for Environmental Policy Analysis." *Environmental and Resource
Economics*. 34(3): 385-406.
[5] Viscusi, W. K. (2004). "The Value of Life: Estimates with Risks by Occupation and Industry." *Economic Inquiry*
42(1): 29-48.
[6] Mrozek, J. R., and L. O. Taylor (2002). "What Determines the Value of Life? A Meta-Analysis." *Journal of Policy
Analysis and Management*. 21(2).
[7] Viscusi, W. K. and J. E. Aldy (2003). "The Value of a Statistical Life: A Critical Review of Market Estimates
Throughout the World." *Journal of Risk and Uncertainty*. 27(1): 5-76.

$9 million at current prices). Miller and Viscusi and Aldy also estimated income elasticities for VSL (the percent increase in VSL per one percent increase in income). Miller's estimates were close to 1.0, while Viscusi and Aldy estimated the elasticity to be between 0.5 and 0.6. DOT used the Viscusi and Aldy elasticity estimate (averaged to 0.55), along with the Wages and Salaries component of the Employer Cost for Employee Compensation, as well as price levels represented by the Consumer Price Index, to project these estimates to a 2007 VSL estimate of $5.8 million.

### 2013 VSL Guidance Update

Since these studies were published, the credibility of these meta-analyses has been qualified by recognition of weaknesses in the data used by the earlier primary studies whose results are synthesized in the meta-analyses. We now believe that the most recent primary research, using improved data (particularly the CFOI data discussed above) and specifications, provides more reliable results. This conclusion is based in part on the advice of a panel of expert economists that we convened to advise us on this issue. The panel consisted of Maureen Cropper (University of Maryland), Alan Krupnick (Resources for the Future), Al McGartland (Environmental Protection Agency), Lisa Robinson (independent consultant), and W. Kip Viscusi (Vanderbilt University). The Panel unanimously concluded that we should base our guidance only on hedonic wage studies completed within the past 10 years that made use of the CFOI database and used appropriate econometric techniques.

A White Paper prepared for the U.S. Environmental Protection Agency (EPA) in 2010 identified eight hedonic wage studies using the CFOI data;[8] we also identified seven additional studies, including five published since the EPA White Paper was issued (see Table 1). Some of these studies focus on estimating VSL values for narrowly defined economic, demographic, or occupational categories, or use inappropriate econometric techniques, resulting in implausibly high VSL estimates. We therefore focused on nine studies that we think are useful for informing an appropriate estimate of VSL. There is broad agreement among researchers that these newer hedonic wage studies provide an improved basis for policy-making.[9]

The 15 hedonic wage studies we have identified that make use of the CFOI database to estimate VSL are listed in Table 1. Several of these studies focus on estimating how VSL varies for different categories of people, such as males and females,[10] older workers and younger workers,[11] blacks and whites,[12] immigrants and non-immigrants,[13] and smokers and non-

---

[8] U.S. Environmental Protection Agency (2010), *Valuing Mortality Risk Reductions for Environmental Policy   A White Paper (Review Draft)*. Prepared by the National Center for Environmental Economics for consultation with the Science Advisory Board – Environmental Economics Advisory Committee.

[9] A current survey of theoretical and empirical research on VSL may be found in: Cropper, M., J.K. Hammitt, and L.A. Robinson (2011). "Valuing Mortality Risk Reductions: Progress and Challenges." *Annual Review of Resource Economics*. 3: 313-336.
http://www.annualreviews.org/doi/abs/10.1146/annurev.resource.012809.103949

[10] Leeth, J.D. and J. Ruser (2003). "Compensating Wage Differentials for Fatal and Nonfatal Injury Risks by Gender and Race." *Journal of Risk and Uncertainty*, 27(3): 257-277.

[11] Kniesner, T.J., W.K. Viscusi, and J.P. Ziliak (2006). "Life-Cycle Consumption and the Age-Adjusted Value of Life." *Contributions to Economic Analysis and Policy*. 5(1): 1-34; Viscusi, W.K. and J.E. Aldy (2007). "Labor Market Estimates of the Senior Discount for the Value of Statistical Life." *Journal of Environmental Economics and Management*. 53: 377-392; Aldy, J.E. and W.K. Viscusi (2008). "Adjusting the Value of a Statistical Life for

smokers,[14] as well as for different types of fatality risks.[15]  Some of these studies do not estimate an overall "full-sample" VSL, instead estimating VSL values only for specific categories of people.  Some of the studies, as the authors themselves acknowledge, arrive at implausibly high values of VSL, because of econometric specifications which appear to bias the results, or because of a focus on a narrowly-defined occupational group.  Moreover, these papers generally offer multiple model specifications, and it is often not clear (even to the authors) which specification most accurately represents the actual VSL.  We have generally chosen the specification that the author seems to believe is best.  In cases where the author does not express a clear preference, we have had to average estimates based on alternative models within the paper to get a representative estimate for the paper as a whole.

## Table 1:  VSL Studies Using CFOI Database

### (VSLs in millions of dollars)

| | Study | Year of Study $ | VSL in Study-Year $ | VSL in 2012$ | Comments |
|---|---|---|---|---|---|
| 1. | Viscusi (2003) * | 1997 | $14.185M | $21.65M | Implausibly high; industry-only risk measure |
| 2. | Leeth and Ruser (2003) * | 2002 | $7.04M | $8.90M | Occupation-only risk measure |
| 3. | Viscusi (2004) | 1997 | $4.7M | $7.17M | Industry/occupation risk measure |
| 4. | Kniesner and Viscusi (2005) | 1997 | $4.74M | $7.23M | Industry/occupation risk measure |
| 5. | Kniesner et al. (2006) * | 1997 | $23.70M | $36.17M | Implausibly high; industry/occupation risk measure |
| 6. | Viscusi and Aldy (2007) * | 2000 | | | Industry-only risk measure; no full-sample VSL estimate |
| 7. | Aldy and Viscusi (2008) * | 2000 | | | Industry-only risk measure, no full-sample VSL estimate |
| 8. | Evans and Smith (2008) | 2000 | $9.6M | $12.84M | Industry-only risk measure |

Age and Cohort Effects." *Review of Economics and Statistics.* 90(3): 573-581; and Evans, M.F. and G. Schaur (2010).  "A Quantile Estimation Approach to Identify Income and Age Variation in the Value of a Statistical Life." *Journal of Environmental Economics and Management.* 59. 260-270.
[12] Viscusi, W.K. (2003).  "Racial Differences in Labor Market Values of a Statistical Life." *Journal of Risk and Uncertainty.* 27(3): 239-256, and Leeth, J.D. and J. Ruser (2003), *op. cit.*
[13] Hersch, J. and W.K. Viscusi (2010).  "Immigrant Status and the Value of Statistical Life." *Journal of Human Resources.* 45(3): 749-771.
[14] Viscusi, W.K. and J. Hersch (2008).  "The Mortality Cost to Smokers." *Journal of Health Economics.* 27: 943-958.
[15] Scotton, C.R. and L.O. Taylor.  "Valuing Risk Reductions:  Incorporating Risk Heterogeneity into a Revealed Preference Framework." *Resource and Energy Economics.* 33 and Kochi, I and L.O. Taylor (2011).  "Risk Heterogeneity and the Value of Reducing Fatal Risks:  Further Market-Based Evidence." *Journal of Benefit-Cost Analysis.* 2(3): 381-397.

| 9. | Viscusi and Hersch (2008) | 2000 | $7.37M | $9.86M | Industry-only risk measure |
|---|---|---|---|---|---|
| 10. | Evans and Schaur (2010) | 1998 | $6.7M | $9.85M | Industry-only risk measure |
| 11. | Hersch and Viscusi (2010) | 2003 | $6.8M | $8.43M | Industry/occupation risk measure |
| 12. | Kniesner *et al.* (2010) | 2001 | $7.55M | $9.76M | Industry/occupation risk measure |
| 13. | Kochi and Taylor (2011)* | 2004 | | | VSL estimated only for occupational drivers |
| 14. | Scotton and Taylor (2011) | 1997 | $5.27M | $8.04M | Industry/occupation risk measure; VSL is mean of estimates from three preferred specifications |
| 15. | Kniesner *et al.* (2012) | 2001 | $4M - $10M | $5.17M - $12.93M | Industry/occupation risk measure; mean VSL estimate is $9.05M |

* Studies shown in grayed-out rows were not used in determining the VSL Guidance value.

We found that nine of these studies provided usable estimates of VSL for a broad cross-section of the population.[16]  We excluded Viscusi (2003) and Kniesner *et al.* (2006) on the grounds that their estimates of VSL were implausibly high (Viscusi acknowledges that the estimated VSLs in his study are very high).  We excluded Leeth and Ruser (2003) because it used only variations in occupation for estimating variation in risk (the occupational classifications are generally regarded as less accurate than the industry classifications).  We excluded Viscusi and Aldy (2007) and Aldy and Viscusi (2008) because they did not estimate overall "full-sample" VSLs (they focused instead on estimating VSLs for various subgroups).  We excluded Kochi and Taylor (2011) because it estimated VSL only for a narrow occupational group (occupational drivers).  For Scotton and Taylor (2011) and Kniesner *et al.* (2012) we calculated average values for VSL from what appeared to be the preferred model specifications.  For our 2013 guidance, we adopted the average of the VSLs estimated in the remaining nine studies, updated to 2012 dollars (based both on changes in the price level and changes in real incomes from the year for which the VSL was originally estimated).  This average was $9.14 million, which we rounded to $9.1 million for purposes of that guidance.

---

[16] In addition to Viscusi (2004) [cited in footnote 4], Viscusi and Hersch (2008) [cited in footnote 13], Evans and Schaur (2010) [cited in footnote 10], Hersch and Viscusi (2010) [cited in footnote 12], and Scotton and Taylor (2011) [cited in footnote 14], these include Kniesner, T.J. and W.K. Viscusi (2005). "Value of a Statistical Life: Relative Position vs. Relative Age." *AEA Papers and Proceedings*. 95(2): 142-146; Evans, M.F. and V.K. Smith (2008). "Complementarity and the Measurement of Individual Risk Tradeoffs: Accounting for Quantity and Quality of Life Effects." National Bureau of Economic Research Working Paper 13722; Kniesner, T.J., W.K. Viscusi, and J.P. Ziliak (2010). "Policy Relevant Heterogeneity in the Value of Statistical Life: New Evidence from Panel Data Quantile Regressions." *Journal of Risk and Uncertainty*. 40: 15-31; and Kniesner, T.J., W.K. Viscusi, C. Woock, and J.P. Ziliak (2012). "The Value of a Statistical; Life: Evidence from Panel Data." *Review of Economics and Statistics*. 94(1): 74-87.

<u>Adjustments for Inflation and Real Income Growth</u>

Updating the VSL from the original base year to a new base year involves adjusting for inflation and real incomes over the intervening years. Specifically, the formula used is:

$$VSL_T = VSL_0 * (P_T / P_0) * (I_T / I_0)^E$$

where

   0 = Original Base Year
   T = Updated Base Year
   $P_t$ = Price Index in Year t
   $I_t$ = Real Incomes in Year t
   $E$ = Income Elasticity of VSL.

<u>Inflation</u>. This guidance uses the Consumer Price Index for All Urban Consumers Current Series (CPI) to adjust for inflation over time, as this price index is deemed to be representative of changes in the value of money that would be considered by a typical worker making decisions corresponding to his income level.  This index grew by 3.23 percent from 2012 to 2015.

<u>Real Incomes</u>. The index we use to measure real income growth as it affects VSL is the Median Usual Weekly Earnings (MUWE), in constant (1982-84) dollars, derived by BLS from the Current Population Survey (Series LEU0252881600 – not seasonally adjusted).  This series is more appropriate than the Wages and Salaries component of the Employment Cost Index (ECI), which we used previously, because the ECI applies fixed weights to employment categories, while the weekly earnings series uses a median employment cost for wage and salary workers over the age of 16.  A median value is preferred because it should better reflect the factors influencing a typical traveler affected by DOT actions (very high incomes would cause an increase in the mean, but not affect the median).  In contrast to a median, an average value over all income levels might be unduly sensitive to factors that are less prevalent among actual travelers.  Similarly, we do not take into account changes in non-wage income, on the grounds that this non-wage income is not likely to be significant for the average person affected by our rules.  While the constant dollar MUWE has been relatively flat over the past two decades, it grew by 1.79 percent from 2012 to 2015.

<u>Income Elasticity</u>. The VSL literature is generally in agreement that VSL increases with real incomes, but the exact rate at which it does so is subject to some debate.  In our 2011 guidance, we cited research by Viscusi and Aldy (2003) that estimated the elasticity of VSL with respect to increases in real income as being between 0.5 and 0.6 (i.e., a one-percent increase in real income results in an increase in VSL of 0.5 to 0.6 percent).  We accordingly increased VSL by 0.55 percent for every one-percent increase in real income.  More recent research by Kniesner, Viscusi, and Ziliak (2010) has derived more refined income elasticity estimates ranging from 2.24 at low incomes to 1.23 at high incomes, with an overall figure of 1.44.[17]  An alternative specification yielded an overall elasticity of 1.32.  Similarly, Costa and Kahn (2004) estimated

---

[17] Kniesner, T.J., W.K. Viscusi, and J.P. Ziliak (2010). "Policy Relevant Heterogeneity in the Value of Statistical Life: New Evidence from Panel Data Quantile Regressions." *Journal of Risk and Uncertainty* 40(1):15-31.

the income-elasticity of VSL to be between 1.5 and 1.6.[18] These empirical results are consistent with theoretical arguments suggesting that the income-elasticity of VSL should be greater than 1.0.[19]

In view of the large increase in the income elasticity of VSL that would be suggested by these empirical results, and because the literature seems somewhat unsettled, we decided in our 2013 guidance to increase our suggested income-elasticity figure only to 1.0. While this figure is lower than the elasticity estimates of Kniesner *et al.* and Costa and Kahn, it is higher than that of Viscusi and Aldy, the basis for our previous guidance. It is difficult to state with confidence whether a cross-sectional income elasticity (such as those estimated in these empirical analyses), representing the difference in sensitivity to fatality risks between low-income and high-income workers in a given population, corresponds to a longitudinal elasticity, representing the way in which VSL is affected by growth in income over time for an overall population. Consequently, we adopt this more moderate figure, pending more comprehensive documentation.

This VSL guidance is updated each year to take into account both the changes in price levels and changes in real incomes. Applying the procedure above for updating the overall VSL value yields an increased VSL of $9.6 million for analyses prepared in 2016 using a 2015 base year. For analyses using base years prior to 2015, the appropriate VSL are found below in Table 2.

Table 2: Prior Year VSL

| Guidance Year | Value (million$) | Base year |
|---|---|---|
| 2015 | 9.4 | 2014 |
| 2014 | 9.2 | 2013 |
| 2013 | 9.1 | 2012 |

## Value of Preventing Injuries

Nonfatal injuries are far more common than fatalities and vary widely in severity, as well as probability. In principle, the resulting losses in quality of life, including both pain and suffering and reduced income, should be estimated by potential victims' WTP for personal safety. While estimates of WTP to avoid injury are available, often as part of a broader analysis of factors influencing VSL, these estimates are generally only available for an average injury resulting in a lost workday, and not for a range of injuries varying in severity. Because detailed WTP

---

[18] Costa, D.L. and M.E. Kahn (2004). "Changes in the Value of Life, 1940-1980." *Journal of Risk and Uncertainty*. 29(2): 159-180.

[19] Eeckhoudt, L.R. and J.K. Hammitt (2001). "Background Risks and the Value of a Statistical Life." *Journal of Risk and Uncertainty*. 23(3): 261-279; Kaplow, L. (2005). "The Value of a Statistical Life and the Coefficient of Relative Risk Aversion." *Journal of Risk and Uncertainty*, 31(1); Murphy, K.M. and R.H. Topel (2006). "The Value of Health and Longevity." *Journal of Political Economy*. 114(5): 871-904; and Hammitt, J.K. and L.A. Robinson (2011). "The Income Elasticity of the Value per Statistical Life: Transferring Estimates between High and Low Income Populations." *Journal of Benefit-Cost Analysis*. 2(1): 1-27.

estimates covering the entire range of potential disabilities are unobtainable, we use an alternative standardized method to interpolate values of expected outcomes, scaled in proportion to VSL. Each type of accidental injury is rated (in terms of severity and duration) on a scale of quality-adjusted life years (QALYs), in comparison with the alternative of perfect health. These scores are grouped, according to the Maximum Abbreviated Injury Scale (MAIS), yielding coefficients that can be applied to VSL to assign each injury class a value corresponding to a fraction of a fatality.

In our 2011 guidance, the values of preventing injuries were updated by new estimates from a study by Spicer and Miller.[20] The measure adopted was the quality-adjusted percentage of remaining life lost for median utility weights, based on QALY research considered "best," as presented in Table 9 of the cited study. The rate at which disability is discounted over a victim's lifespan causes these percentages to vary slightly, and the study shows estimates for 0, 3, 4, 7, and 10 percent discount rates. These differences are minor in comparison with other sources of variation and uncertainty, which we recognize by sensitivity analysis. Since OMB recommends the use of alternative discount rates of 3 and 7 percent, we present the scale corresponding to an intermediate rate of 4 percent for use in all analyses. The fractions shown should be multiplied by the current VSL to obtain the values of preventing injuries of the types affected by the government action being analyzed.

Table 3: Relative Disutility Factors by Injury Severity Level (MAIS)
For Use with 3% or 7% Discount Rate

| MAIS Level | Severity | Fraction of VSL |
|------------|----------|-----------------|
| MAIS 1 | Minor | 0.003 |
| MAIS 2 | Moderate | 0.047 |
| MAIS 3 | Serious | 0.105 |
| MAIS 4 | Severe | 0.266 |
| MAIS 5 | Critical | 0.593 |
| MAIS 6 | Unsurvivable | 1.000 |

Note that these factors represent an average disutility of all injuries sustained by persons with a given MAIS. Although injured persons normally have multiple injuries, only one disutility factor should be applied to each injured person. For example, if the analyst were seeking to estimate the value for an injured person whose highest level injury was rated "serious" (MAIS 3), he or she would multiply the Fraction of VSL for a serious injury (0.105) by the VSL ($9.6 million) to calculate the value of the serious injury ($1.01 million).

---

[20] Rebecca S. Spicer and Ted R. Miller. "Final Report to the National Highway Traffic Safety Administration: Uncertainty Analysis of Quality Adjusted Life Years Lost." Pacific Institute for Research and Evaluation. February 5, 2010. http://ostpxweb.dot.gov/policy/reports/QALY Injury Revision_PDF Final Report 02-05-10.pdf.

These factors have two direct applications in analyses. The first application is as a basis for establishing the value of preventing nonfatal injuries in benefit-cost analysis. The total value of preventing injuries and fatalities can be combined with the value of other economic benefits not measured by VSLs, and then compared to costs to determine either a benefit/cost ratio or an estimate of net benefits.

The second application stems from the requirement in OMB Circular A-4 that evaluations of major regulations for which safety is the primary outcome include cost-effectiveness analysis, in which the cost of a government action is compared with a non-monetary measure of benefit. The values in the above table may be used to translate nonfatal injuries into fatality equivalents which, when added to fatalities, can be divided into costs to determine the cost per equivalent fatality. This ratio may also be seen as a "break-even" VSL, the value that would have to be assumed if benefits of a proposed action were to equal its costs. It would illustrate whether the costs of the action can be justified by a VSL that is well within the accepted range or, instead, would require a VSL approaching the upper limit of plausibility. Because the values assigned to prevention of injuries and fatalities are derived in part by using different methodologies, it is useful to understand their relative importance in drawing conclusions. Consequently, in analyses where benefits from reducing both injuries and fatalities are present, the estimated values of injuries and fatalities prevented should be stated separately, as well as in the aggregate.

### Recognizing Uncertainty

Regulatory and investment decisions must be made by officials informed of the limitations of their information. The values we adopt here do not establish a threshold dividing justifiable from unjustifiable actions; they only suggest a region where officials making these decisions can have relatively greater or lesser confidence that their decisions will generate positive net benefits. To convey the sensitivity of this confidence to changes in assumptions, OMB Circular A-4 and Departmental policy require analysts to prepare estimates using alternative values. We have previously encouraged the use of probabilistic methods such as Monte Carlo analysis to synthesize the many uncertain quantities determining net benefits.

While the individual estimates of VSL reported in the studies cited above are often accompanied by estimates of confidence intervals, we do not, at this time, have any reliable method for estimating the overall probability distribution of the average VSL that we have calculated from these various studies. Consequently, alternative VSL values can only illustrate the conclusions that would result if the true VSL actually equaled the higher or lower alternative values. Analysts should not imply a known probability that the true VSL would exceed or fall short of either the primary VSL figure or the alternative values used for sensitivity analysis. Kniesner *et al.* (2012) suggest that a reasonable range of values for VSL is between $4 million and $10 million (in 2001 dollars), or about $5.4 million to $13.4 million in 2015 dollars. This range of values includes all the estimates from the eight other studies on which this guidance is based. For illustrative purposes, analysts should calculate high and low alternative estimates of the values of fatalities and injuries by using alternative VSLs of $5.4 million and $13.4 million.

Because the relative costs and benefits of different provisions of a rule can vary greatly, it is important to disaggregate the provisions of a rule, displaying the expected costs and benefits of

11

each provision, together with estimates of costs and benefits of reasonable alternatives to each provision.

This guidance and other relevant documents will be posted on the Office of Transportation Policy website, http://www.dot.gov/policy/transportation-policy/economy. Questions should be addressed to Darren Timothy, (202) 366-4051, or darren.timothy@dot.gov.

# Revised Departmental Guidance on Valuation of a Statistical Life in Economic Analysis

📄 2016 Revised Value of a Statistical Life Guidance.pdf

## About this Document

The benefit of preventing an injury or fatality is measured by what is conventionally called the Value of a Statistical Life (VSL), defined as the additional cost that individuals would be willing to bear for improvements in safety (that is, reductions in risks) that, in the aggregate, reduce the expected number of fatalities by one. The value of a statistical life is a critical factor in evaluating the benefits of transportation infrastructure investment and rulemaking initiatives. Reduction of injuries and fatalities in passenger or freight transportation is a major purpose of investments, and rules that slow travel may sometimes enhance safety. As the Department expands its use of benefit-cost analysis in evaluating competitive funding applications under such programs as the TIGER Grant program and the High-Speed Intercity Passenger Rail program, it is essential to have appropriate, well-reasoned guidance for valuing safety benefits.

### Background

Department guidance on valuing the reducation of fatalities and injuries by regulations or investments has been published periodically by DOT since 1993. The present memorandum adjusts these values for use in the current year. Income data used in this guidance are derived from public and regularly updated sources that allow the Department to update the values annually.

### Previous Value of a Statistical Life Guidance

2015 Revised Value of a Statistical Life Guidance

*DOT is committed to ensuring that information is available in appropriate alternative formats to meet the requirements of persons who have a disability. If you require an alternative version of files provided on this page, please contact rvan.endorf@dot.gov*

.

Submit Feedback >

*Contact Us*

**Office of the Chief Economist**
Asst. Secretary for Transportation Policy
1200 New Jersey Ave, SE
Washington, DC 20590
United States

Phone: 202-366-4813
TTY/Assistive Device: 800-877-8339

Business Hours:
8:30am-5:00pm ET, M-F

*Tags*

* economy

*Share*

Submit Feedback >

Menu

United States Environmental Protection Agency

| Search EPA.gov |
|---|

Related Topics:  Environmental Economics

 Share

Contact Us

# Mortality Risk Valuation

This page contains information on Frequently Asked Questions on Mortality Risk Valuation and EPA practices concerning the use and measurement of the "Value of a Statistical Life" as it is applied in EPA economic analyses.

- What does it mean to place a value on life?
- Why do Agencies attempt to value risk reductions in dollars?
- What is Benefit-Cost Analysis?
- What is Benefit-Cost Analysis used for?
- What is the "Value of a Statistical Life"?
- What value of statistical life does EPA use?
- What other values has EPA used in the past?
- What is the current process for updating the Agency's estimates?
- Why is EPA proposing to change the terminology it uses when valuing changes in mortality risk?
- How does the "Value of Mortality Risk" Differ from the Value of a Statistical Life?
- How will EPA Estimate the Value of Mortality Risk (VMR)?
- Is EPA proposing a numeric value for VMR?
- What is a Cancer Differential?
- What are Altruistic Preferences?
- When will revised Guidance on Mortality Risk Valuation be available?
- Related References

## What does it mean to place a value on life?

The EPA does not place a dollar value on individual lives. Rather, when conducting a benefit-cost analysis of new environmental policies, the Agency uses estimates of how much people are willing to pay for small reductions in their risks of dying from adverse health conditions that may be caused by environmental pollution.

In the scientific literature, these estimates of willingness to pay for small reductions in mortality risks are often referred to as the "value of a statistical life." This is because these values are typically reported in units that match the aggregate dollar amount that a large group of people would be willing to pay for a reduction in their individual risks of dying in a year, such that we would expect one fewer death among the group during that year on average. This is best explained by way of an example. Suppose each person in a sample of 100,000 people were asked how much he or she would be willing to pay for a reduction in their individual risk of dying of 1 in 100,000, or 0.001%, over the next year. Since this reduction in risk would mean that we would expect one fewer death among the sample of 100,000 people over the next year on average, this is sometimes described as "one statistical life saved." Now suppose that the average response to this hypothetical question was $100. Then the total dollar amount that the group would be willing to pay to save one statistical life in a year would be $100 per person × 100,000 people, or $10 million. This is what is meant by the "value of a statistical life." Importantly, this is not an estimate of how much money any single individual or group would be willing to pay to prevent the certain death of any particular person.

Top of Page

# Why do Agencies attempt to value risk reductions in dollars?

Agencies use estimates of values of risk reductions when conducting a benefit-cost analysis of a new policy or regulation that may affect public health. For example, many of the air and water pollution control regulations that are implemented by the EPA will reduce the risks of certain types of cancers, respiratory illnesses, and other diseases among large portions of the general public. Benefit-cost analysis compares the total willingness to pay for the health risk reductions from these policies to the additional costs that people will bear if the policies are adopted. These costs may come in the form of increased taxes, or, more commonly, increased prices of goods and services whose production, use, or disposal contributes to environmental pollution. The results of a benefit-cost analysis are presented to policy-makers and the public to help inform their judgments regarding whether or not a proposed policy should be adopted.

Only one federal environmental statute, the Safe Drinking Water Act, explicitly calls for the kind of formal benefit-cost analysis describe here. Most environmental laws do not require benefit-cost analysis, and some prohibit it (e.g., the air quality standards provisions of the Clean Air Act). Nevertheless, Presidential Executive Orders have required or encouraged the use of benefit-cost analysis in policy evaluation since the early 1980's. For "major" regulations—those expected to have an impact on the economy of $100 million or more—federal agencies are required by Executive Order 12866 to conduct a formal benefit-cost analysis as a way of informing both policy makers and the public.

Top of Page

# What is Benefit-Cost Analysis?

Benefit-cost analysis is an analytical tool used to evaluate public policy options. For environmental policies, benefits are determined by what individuals would be willing to pay for risk reductions or for other improvements from pollution prevention. Costs are determined by the dollar value of the resources directed to pollution reduction. If the total benefits exceed the total costs, then the policy is said to "pass a benefit-cost test."

Of course in most cases where the total benefits exceed total costs, it will *not* be true that the benefits exceed the costs for each and every person affected by the policy; rather, some individuals will gain and others will lose. However, if the total benefits are greater than the costs, then it is *in principle* possible for those who gain to compensate those who lose so that everyone could be better off with the policy. This is what it means for a policy to pass a benefit-cost test.

The benefit-cost test alone is not the only relevant criterion for evaluating public policies since it omits important aspects of the policy decision. In particular, the benefit-cost criterion does not consider the distribution of benefits and costs among the affected individuals. These distributional effects often will be important to policy-makers and the general, so benefit-cost analysis typically will need to be supplemented by other information.

Top of Page

# What is Benefit-Cost Analysis used for?

The primary purpose of benefit cost analysis is to provide policy makers and others with detailed information on a wide variety of consequences of environmental policies.

Benefit-cost analysis is only one of many inputs into policy evaluation. Other factors include environmental justice considerations; ethical concerns; enforceability; legal consistency; and technological and institutional feasibility.

# What is the "Value of a Statistical Life"?

See "What does it mean to place a value on life?"

# What value of statistical life does EPA use?

EPA recommends that the central estimate of $7.4 million ($2006), updated to the year of the analysis, be used in all benefits analyses that seek to quantify mortality risk reduction benefits regardless of the age, income, or other population characteristics of the affected population until revised guidance becomes available (see "What is the current process for updating the Agency's estimates?" below). This approach was vetted and endorsed by the Agency when the 2000 *Guidelines for Preparing Economic Analyses* were drafted. Although $7.4 million ($2006) remains EPA's default guidance for valuing mortality risk changes, the Agency has considered and presented others (see "What Values Has EPA Used in the Past?" below.)

Top of Page

# What other values has EPA used in the past?

Few economic analyses prepared by EPA calculated monetary benefits until the mid-1980s. One of the earliest major EPA regulations that developed more detailed economic estimates of the benefits of proposed regulatory standards was the National Ambient Air Quality Standards for particulate matter (USEPA 1984). This analysis drew on a review of six wage-risk studies published during 1976-1981 with a central estimate of $4.6 million (2001$). Around this same time EPA issued its first economic guidance and reported a range of VSL estimates for use in policy analysis of $0.7 to $12.9 million (2001$) (USEPA 1983). The next major review of mortality risk valuation came in the mid-1990s when EPA reported to Congress on the economic benefits and costs of the Clean Air Act (USEPA 1997). This report based its VSL findings on 26 studies, 21 from the wage-risk literature and five from stated preference studies. This study forms the basis of EPA's existing mortality risk valuation guidance discussed above.

Beginning in 2004 EPA's Office of Air and Radiation (OAR) used an estimate of $5.5 million (1999 dollars; $6.6 million in 2006 dollars) for the analysis of air regulations. This estimate was derived from the range of values estimated in three meta-analyses of VSL conducted after EPA's *Guidelines* were published in 2000 (Mrozek and Taylor (2000), Viscusi and Aldy (2003), and later, Kochi, et al. (2006).) However, the Agency neither changed its official guidance on the use of VSL in rule-makings nor subjected the interim estimate to a scientific peer-review process through the Science Advisory Board (SAB) or other peer-review group.

While the Agency is updating its guidance by incorporating the most up-to-date literature and recent recommendations from the SAB-EEAC, it has determined that a single, peer-reviewed estimate applied consistently best reflects the SAB-EEAC advice until updated guidance is available. Therefore, EPA has decided to return to the value established in the 2000 *Guidelines* for all its actions until a revised estimate can be fully vetted within the Agency and by EPA's Science Advisory Board.

Top of Page

## What is the current process for updating the Agency's estimates?

EPA is committed to using the best available science in its analyses and is in the process of revisiting its guidance on valuing mortality risk reductions.

- EPA has engaged the Science Advisory Board Environmental Economics Advisory Committee (SAB-EEAC) on several issues related to mortality risk valuation, including the use of meta-analysis – a statistical technique used to combine results from individual studies addressing similar problems.
- Following advice of the SAB-EEAC, EPA formed an expert panel to explore issues of meta-analysis (see USEPA 2006).
- In addition, EPA commissioned reports on the various approaches used in the literature to estimate the value of mortality risk reductions (Alberini 2004, Black *et al*. 2003, and Blomquist 2004).

EPA is now taking all of this information into account in the guidance revision process. The Agency has prepared a white paper on *Valuing Mortality Risk Reductions in Environmental Policy* (PDF, 1795.3K, About PDF) featuring EPA's latest review of important issues surrounding how to value the reductions in risk to human health from environmental regulations and other Agency decisions. EPA has submitted the whitepaper to its Science Advisory Board for feedback and recommendations on several issues including:

- replacing the often misunderstood term "value of statistical life" with the more accurate term "value of mortality risk reduction;"
- accounting for potential differences in people's willingness to pay for cancer mortality risk reductions relative to mortality risks from workplace or other accidental deaths when estimating the benefits of actions that are expected to reduce cancer-causing pollutants;
- accounting for possible differences in people's willingness to pay for risk reductions that will be experienced by others due to altruistic preferences in benefit-cost estimation; and
- synthesizing the body of evidence of people's willingness-to-pay for reducing mortality risks to inform benefit-cost analysis.

The process ultimately used to revise estimates for use in benefit-cost analysis will be informed by the recommendations from the SAB Review.

Top of Page

## Why is EPA proposing to change the terminology it uses when valuing changes in mortality risk?

The Agency believes that its benefit-cost analyses would be more transparent and comprehensible if the term "value of statistical life" were replaced with an alternative term that more accurately describes the health risk changes that are being analyzed. The term "value of statistical life" can give the misleading impression that a "price" is being placed on individual lives--as a mugger who says, "Your money or your life!?" In reality, EPA regulations typically lead to small reductions in mortality risks (ranging up to 1 in 1,000 per year) for large numbers of people. A benefit-cost analysis attempts to estimate the total sum of money that a large number of people would be willing to pay to reduce their mortality risks by amounts in this general range. The term "value of mortality risk reduction" conveys this idea more clearly and should reduce the confusion that sometimes arises when discussing the "value of statistical lives." It is important to understand that by adopting new terminology the Agency is not changing the economic theory that underlies these valuations. Furthermore, no matter which term is applied, the same underlying data would be used to estimate the value, and these values would lead to the same aggregate benefits if applied to the same policy proposal.

Top of Page

## How does the "Value of Mortality Risk" Differ from the Value of a Statistical Life?

The Value of Mortality Risk (VMR) and the Value of Statistical Life (VSL) are indeed related. The underlying theoretical concept is the same, and the estimated values for either metric would be based on the same published literature. The difference lies in the choice of units used to aggregate and report the risk changes. The VSL is typically reported in units of dollars per statistical death per year. The VMR would be reported in units such as dollars per micro-risk per person per year, where a "micro-risk" represents a one in a million chance of dying. EPA is proposing using VMR because it should help to reduce the misunderstandings that are sometimes caused by the VSL terminology.

## How will EPA Estimate the Value of Mortality Risk (VMR)?

For decades economists have been studying how people make tradeoffs between their own income and risks to their health and safety. These tradeoffs can reveal how people value, in dollar terms, small changes in risk. For example, purchasing automobile safety options reveals information on what people are willing to pay to reduce their risk of dying in a car accident. Purchasing smoke detectors reveals information on what people are willing to pay to reduce their risk of dying in a fire. EPA will review all of the peer-reviewed scientific studies of these income and health risk trade-offs and will attempt to summarize the results in a single best central estimate or range of estimates to use in benefit-cost analyses.

## Is EPA proposing a numeric value for VMR?

No, EPA is not proposing a numeric value for VMR at this time. The White Paper under review by the SAB-EEAC proposes a methodology for both incorporating the latest scientific evidence on how people value small reductions in their risk of dying and combining the estimates in the over 80 studies in the literature. EPA has identified a set of criteria for selecting studies from the literature and outlined a method for identifying appropriate estimates from those studies. The White Paper highlights a number of statistical issues that are associated with combining estimates from the studies and is seeking SAB feedback on how best to address these issues. EPA has proposed several options for identifying the best estimate or set of estimates for a VMR, but does not propose a value in this White Paper.

Top of Page

## What is a Cancer Differential?

A cancer differential is the additional amount that people are willing to pay to reduce cancer risks relative to accidental or other categories of mortality risks. In part, this may reflect the extended period of illness that accompanies life-threatening cancer, but it may also include intangible factors such as the additional feeling of dread associated with cancer. If people value different types of risk differently, then benefits analysis for different types of policies would ideally reflect these preferences. As described in the *White Paper on Valuing Mortality Risk Reductions in Environmental Policy*, EPA believes there is now sufficient scientific evidence for including a cancer differential in economic analysis of policies that reduce exposure to cancer-causing pollutants. This issue is one of the subjects for EPA's upcoming consultation with the Environmental Economics Advisory Committee of the Science Advisory Board.

Top of Page

## What are Altruistic Preferences?

Altruism is the concern for others. We know from studies that individuals are often willing to pay more when there are reductions in risks to themselves as well as others. That is, many studies show that individuals express altruism when asked how much they would be willing to pay to reduce risks to themselves as well as other people. Since most environmental policy addresses public risks that we

all face in common, then it may be important to capture these altruistic preferences in our benefit-cost analysis. This issue is one of the subjects for EPA's upcoming consultation with the Environmental Economics Advisory Committee of the Science Advisory Board.

## When will revised Guidance on Mortality Risk Valuation be available?

Producing Agency guidance on mortality risk valuation is a multi-step process and will, in part, depend on the recommendations received from the Science Advisory Board. Clear guidance based on the best available scientific information that can be consistently applied across the Agency is the goal. While this may take some time to complete, the goal is to issue new guidance in 2011.

Top of Page

## Related References

Alberini, Anna. 2004. Willingness to Pay for Mortality Risk Reductions: A Re-examination of the Literature. *Draft Final Report*, Cooperative Agreement with U.S. Environmental Protection Agency, #015-29528.

Black, Dan A. and Thomas J. Kniesner. 2003. On the Measurement of Job Risk in Hedonic Wage Models. *Journal of Risk and Uncertainty* 27(3): 205-220.

Blomquist, Glenn C. 2004. Self-Protection and Averting Behavior, Values of Statistical Lives, and Benefit Cost Analysis of Environmental Policy. *Review of Economics of the Household 2*: 89-100.

Kochi, Ikuho; Bryan Hubbell and Randall Kramer. 2006. "An Empirical Bayes Approach to Combining and Comparing Estimates of the Value of a Statistical Life for Environmental Policy Analysis," *Environmental and Resource Economics*, 34: 385-406.

Mrozek, J. and Laura Taylor. 2002. "What Determines the Value of Life? A Meta Analysis," *Journal of Policy Analysis and Management*, 21(2), 253-70.

U.S. Environmental Protection Agency. 1983. *Guidelines for Performing Regulatory Impact Analyses*. Office of Policy Analysis, EPA-230-01-84-003.

U.S. Environmental Protection Agency. 1984. *Regulatory Impact Analysis for NAAQS for Particulate Matter* (PDF, 474 pp., 10.17 MB, About PDF). Office of Air and Radiation.

U.S. Environmental Protection Agency. 1997. *The Benefits and Costs of the Clean Air Act 1970-1990*. Prepared for Congress by Office of Air and Radiation and Office of Policy, Planning and Evaluation. October 1997.

U.S. Environmental Protection Agency. 1999. *The Benefits and Costs of the Clean Air Act: 1990-2010*. Prepared for Congress by Office of Air and Radiation and Office of Policy, EPA 410-R-99-001, November 1999.

U.S. Environmental Protection Agency. 2000. *Guidelines for Preparing Economic Analyses*, Office of the Administrator. EPA-240-R-00-003, December 2000.

U.S. Environmental Protection Agency. 2006. Report of the EPA Workgroup on VSL Meta-Analysis, May 31, 2006.

Viscusi, W. K. 1992. Fatal *Tradeoffs: Public and Private Responsibilities for Risk.* New York, NY: Oxford University Press.

Viscusi, W. Kip and Aldy, Joseph E. 2003. "The Value of a Statistical Life: A Critical Review of Market Estimates throughout the World," *Journal of Risk and Uncertainty,* Springer, vol. 27(1), pages 5-76, August.

Top of Page

Contact Us to ask a question, provide feedback, or report a problem.

## Discover.

Accessibility

EPA Administrator

Budget & Performance

Contracting

Grants

No FEAR Act Data

Privacy and Security

## Connect.

Data.gov

Inspector General

Jobs

Newsroom

## Ask.

Contact Us

Hotlines

FOIA Requests

Frequent Questions

**Open Government**

**Regulations.gov**

**Subscribe**

**USA.gov**

**White House**

Follow.

LAST UPDATED ON MAY 27, 2016

Back to previous page



document 1 of 1

# Why the Government Puts a Dollar Value on Life; To analyze the benefits of high-cost regulations, pricing the priceless is a necessary calculation

Jo Craven McGinty. **Wall Street Journal (Online)**; New York, N.Y. [New York, N.Y]25 Mar 2016: n/a.

THE WALL STREET JOURNAL.

## Abstract

Economists analyze what people spend, for example on cars with improved safety features, as well as what they accept, such as hazard pay for more dangerous jobs. "Rand was crunching thousands of numbers on flight range, different kinds of planes, how much fuel was required, what kind of weapons could the planes carry, what was the cost to make them," said H. Spencer Banzhaf, an economist at Georgia State University who documented the Cold-War origins of the VSL .

## Full Text

How much is a life worth?

Most people balk at putting a number on something so precious, but when the government considers implementing expensive regulations to save lives, it must determine whether the benefits outweigh the costs.

"Some things are worth doing," said Timothy Taylor, an economist and managing editor of the Journal of Economic Perspectives. "Some things are not."

Figuring out the costs is the easy part. The price of equipping cars with seatbelts and airbags is knowable. So are the costs of reducing air pollution, ridding water of contaminants, sanitizing milk, installing guardrails, enforcing speed limits and myriad other safeguards.

But putting a value on the benefits of these safeguards is trickier. If they succeed, fewer people will get sick or injured. A certain number of lives will be saved.

To help reduce benefits to a dollar figure that can be compared with costs, the government uses a tool called the value of a statistical life.

Although its name suggests otherwise, the VSL is not a price tag stamped on the forehead of an individual. It's an estimate of the amount of money the public is willing to spend to reduce risk enough to save one life.

https://search.proquest.com/printviewfile?accountid=11371

But that mouthful of a definition is often rendered more simply as the government's value of a life, and it's a concept that causes tempers to boil over.

In 2008, an outraged U.S. senator introduced legislation to block the Environmental Protection Agency when it said planned to lower its estimate.

An economist at the University of Oregon collected nearly 200 irate comments from online news sources posted by people who were furious the government would even consider attaching a dollar figure to a human being.

It remains so touchy that last month the EPA said it intends to change the name to something less provocative the next time it adjusts its estimate.

Assigning a dollar value to a human life may be repugnant, but in this case, the anger is misplaced.

Government agencies are required to conduct a cost-benefit analysis for every regulation expected to cost $100 million or more in a year, according to W. Kip Viscusi an economist at Vanderbilt University. The VSL adds weight to the benefits side of the equation.

Different agencies settle on their own numbers with the help of research conducted by Mr. Viscusi and other economists, but the figures tend to be in the same ballpark. In 2013, the EPA estimated the value at $9.7 million. The Department of Transportation placed its figure at $9.4 million in 2014. And the Food and Drug Administration put its figure at $9.3 million in 2015. Estimates are adjusted periodically to reflect changes in inflation and incomes.

The estimates are generated from information gleaned from surveys and market data that reveal the choices people make in different risky situations.

"The beauty of the methodology is that it uses values people have expressed through the market rather than a government office arbitrarily making up a number," Mr. Viscusi said. "It uses the value people themselves think risks are worth."

Economists analyze what people spend, for example on cars with improved safety features, as well as what they accept, such as hazard pay for more dangerous jobs. With this information, the economists figure out how much an individual is willing to pay to reduce a risk and then multiply the amount over the population exposed to the risk.

Government agencies refer to a laundry list of these figures to arrive at an appropriate VSL for their purposes. If an agency uses a VSL of $9.4 million and applies it to a policy it projects will save 10 lives, the benefit would be valued at $94 million, or 10 times the VSL.

Alternatives to the VSL include using income, generally considered an insufficient measure, or not putting a dollar value on lives saved at all.

In 1950, the U.S. Air Force asked Rand Corp. to develop a strategy to strike the Soviet Union if the order was given.

"Rand was crunching thousands of numbers on flight range, different kinds of planes, how much fuel was required, what kind of weapons could the planes carry, what was the cost to make them," said H. Spencer Banzhaf, an economist at Georgia State University who documented the Cold-War origins of the VSL . Rand concluded the Air Force should fill the skies with clouds of cheap propeller planes."

Under the plan, only a few of the planes would carry nuclear bombs, but the Soviets wouldn't know which was which. There was a significant downside: The casualty rate would be high.

"The Air Force general said what about the pilots?" Mr. Banzhaf said. "Rand said it didn't include the pilots because they couldn't come up with a number."

More Numbers

* Like numbers? Check out past columns

* Join the conversation at The Numbers blog

* Follow The Numbers on Twitter

The Air Force rejected the plan, and Rand started over, but it continued to struggle with how to account for airplane crews.

It wasn't until 1968--almost two decades later--that an economist named Thomas Schelling hit upon the idea of using consumer responses to everyday risks to calculate what he dubbed the value of a statistical life.

His objective, Mr. Banzhaf writes, wasn't to tackle the worth of life. It was to value the postponement of death.

Was it a perfect solution? Probably not. But was it better than nothing? You bet your life.

Write to Jo Craven McGinty at Jo.McGinty@wsj.com

Credit: By Jo Craven McGinty

(c) 2016 Dow Jones & Company, Inc. Reproduced with permission of copyright owner. Further reproduction or distribution is prohibited without permission.

# Details

| Subject | Government agencies; Costs |
|---|---|

Company / organization

| | Name: | Environmental Protection Agency--EPA |
|---|---|---|
| | NAICS: | 924110; |

| | Name: | Department of Transportation |
|---|---|---|
| | NAICS: | 926120; |

5/10/2018, 3:27 PM

| | |
|---|---|
| Name: | University of Oregon |
| NAICS: | 611310 |
| Title | Why the Government Puts a Dollar Value on Life; To analyze the benefits of high-cost regulations, pricing the priceless is a necessary calculation |
| Author | Jo Craven McGinty |
| Lexile score | 1400L |
| Publication title | Wall Street Journal (Online); New York, N.Y. |
| Pages | n/a |
| Publication year | 2016 |
| Publication date | Mar 25, 2016 |
| Section | US |
| Publisher | Dow Jones & Company Inc |
| Place of publication | New York, N.Y. |
| Country of publication | United States, New York, N.Y. |
| Publication subject | Business And Economics |
| Source type | Newspapers |
| Language of publication | English |
| Document type | News |
| ProQuest document ID | 1775647110 |
| Document URL | https://search.proquest.com/docview/1775647110?accountId=11371 |

https://search.proquest.com/printviewfile?accountid=11371

| Last updated | 2017-11-22 |
| --- | --- |
| Database | 2 databases View list |
| | eLibrary |
| | ProQuest Central |

Database copyright © 2018 ProQuest LLC. All rights reserved. Terms and Conditions

**The New York Times** | https://nyti.ms/3cnXFJg

THE NEW HEALTH CARE

# *Putting a Dollar Value on Life? Governments Already Do*

Trade-offs are routine in health policy, and the math and analysis underlying them have been around for decades.

 **By Austin Frakt**

May 11, 2020

How much money is a life worth?

To many, the answer is so obvious that the question is offensive: Life is immeasurably valuable. No price is too high.

During the pandemic, some economists and health experts have said there's not necessarily a need to weigh the balance between saving lives and saving the economy — that prioritizing fighting the coronavirus will benefit the economy.

In more ordinary times, trade-offs are common. They have arisen in policy deliberations for decades.

## How the dollar value of life has changed over decades

There has always been a limit to how much we are willing to spend to protect life and health. After all, no society can spend a limitless amount.

In his book The Economists' Hour, Binyamin Appelbaum of The New York Times documents how estimates of the economic value of life have influenced regulatory decisions since the 1970s. In 1972, a member of a Nixon administration task force on regulating the auto industry put a life's worth at $885,000 in today's dollars.

Two years later, using a similar figure, the Department of Transportation rejected a regulation to install bars at the rear of trucks to prevent passenger vehicles from sliding underneath them in a collision. The reasoning? It would not have been cost effective, meaning the cost would have exceeded the value of lives it would have saved. The bars became required in 1998 when the Department of Transportation's value of a life reached $2.5 million.

The dollar value placed on life and how it is used has changed with the political tides.

In 1979, as he announced reforms in the regulatory process, President Jimmy Carter signaled support for cost-effectiveness calculations. "Society's resources are vast, but they are not infinite," he said. "We must ensure that regulation gives Americans their money's worth." A mere two years later, Al Gore, then a congressman, called cost effectiveness an "attempt to cripple" essential government functions. "What dollar figure can be assigned to the avoidance of birth deformities?" he said.

More recently, under President George W. Bush, the dollar value of life for regulatory decisions went down. Under President Barack Obama, it went up.

One of the earliest values of life used in regulation came from a 1978 calculation by the Canisius College economics professor Warren Prunella. He estimated the value of a life saved by proposed furniture fabric flammability standards at $1 million, which was later adopted by Congress for regulations made by the Consumer Product Safety Commission.

Today, the commission uses a figure of $8.7 million. Other U.S. departments' and agencies' values differ somewhat. The Environmental Protection Agency uses $7.4 million. The Department of Transportation (which includes the Federal Aviation Administration) uses $9.6 million.

People rarely notice these uses of cost effectiveness by the government. The gears of regulation tend to turn in obscurity. But when cost effectiveness arises in health care, it's hard not to notice, as when Sarah Palin said an early version of the Affordable Care Act legislation included "death panels." (The charge was based on the claim that health care would be withheld from people whose lives would be judged "not worth it," which was not true.)

## How some other nations view it

When it's our health, or that of loved ones, we bristle at the thought of being denied coverage for care because it's too costly.

Outside the U.S., it is not so unusual to judge some treatments as worth it and others not. The World Health Organization has a formula for governments in making these decisions, starting with dividing the annual G.D.P. of a nation per person. The W.H.O. suggests paying for treatments that cost less than three times this figure for each year of good health they provide. (A treatment that costs less than one time the national annual G.D.P. per capita is considered highly cost effective.)

So for example, if a country's per capita G.D.P. were $65,000 (roughly the figure for the U.S.), a treatment that cost less than $195,000 for one year of good health — a so-called quality-adjusted life year — would be considered cost effective according to the W.H.O. standard.

An analysis of Australia's pharmaceutical benefits advisory committee found that it was likely to approve a drug if its cost per quality-adjusted life year was below 1.35 times the per capita G.D.P. in 1999. Poland legislated in 2012 a cost-effectiveness threshold of three times per capita G.D.P., and Thailand has a 0.8 per capita G.D.P. threshold.

Sign Up

**CORONAVIRUS SCHOOLS BRIEFING:** *The pandemic is upending education. Get the latest news and tips as students go back to school.*

Many studies have attempted to deduce how much Americans are willing to pay for a year of life in good health. The values vary considerably, some as low as $10,000. A study published in 2008 put the figure as high as $297,000; other assessments approach $1 million.

But $100,000 to $200,000 has become the standard range, endorsed by many health economists. In addition to reflecting insights of experts, "this range draws on experience working with decision makers to manage health care's budget impact," said Christopher McCabe, executive director and C.E.O. of the Institute of Health Economics in Alberta, Canada.

Whatever the value, no threshold is explicitly applied to health care coverage decisions in the United States. Allowing others to decide what care is worth paying for and what isn't strikes many as distasteful or unfair.

We tend to value treatments that assist people who are close to death, spending more for them than on treatments for others that ultimately spare more lives. This too reflects values not easily translated into math.

"All ways of deciding how to use collective resources are discriminatory to someone," Mr. McCabe said. "The best we can hope for is to make those decisions in a transparent process. A fundamental problem in the U.S. is that there is no agreement on that process."

Many countries and organizations that use cost effectiveness in health care recognize and take on this challenge. For example, Britain's National Institute for Health and Care Excellence is more likely to recommend coverage of a treatment if it costs less than £20,000 to £30,000 (equivalent to $25,000 to $37,000) per additional life year it provides (adjusted for quality of life). But this is not a hard and fast rule. The body also considers other factors, including the condition and population it treats, the level of evidence of effectiveness and the availability of alternative treatments, among others.

Likewise, the Institute for Clinical and Economic Review — a private, nonprofit group in the United States that assesses the effectiveness and value of health care treatments — considers cost effectiveness alongside a range of contextual factors that such an analysis is likely to miss. To further ensure that all values are considered, both groups hold open meetings and invite comments on draft documents.

Reflecting the fact that there is no "right" price for a life, there is no single, correct way to combine all these factors and perspectives. But deliberating openly and allowing public comment help reconcile our personal sense that we want limitless health care for ourselves and the collective constraint that there are limits to what society can afford.